UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

DALE WATERS, WESTERN HEART           :
INSTITUTE, P.C., RETIREMENT PLAN,    :
Individually and on Behalf of All Others      :
Similarly Situated,                           :    08-CV-8484
                      Plaintiffs,      :    (RJS)
                                      :
        against                 :
                                      :
GENERAL ELECTRIC COMPANY,         :
JEFFREY R. IMMELT and KEITH S. SHERIN,  :
                                      :
                                      :
              Defendants.      :

----------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
*Counsel for Defendants*
*General Electric Company,*
*Jeffrey R. Immelt, and Keith S. Sherin*

January 15, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

STATEMENT OF FACTS .................................................................................................... 7

      A.     Market Conditions Deteriorate in September 2008............................................ 8

      B.     GE's Statements During the Class Period ........................................................... 8

      C.     Accelerating Volatility, Uncertainty, and Turmoil ............................................ 9

      D.     GE's Pricing of the Public Offering on October 2, 2008 ................................. 12

ARGUMENT ...................................................................................................................... 13

I.     The Complaint Fails To Allege Facts that Give Rise to a Strong Inference of
      Scienter ...................................................................................................................... 13

      A.     Plaintiffs' Allegations of Motive and Opportunity Fail ................................... 14

      B.     Plaintiffs' Allegations of Conscious Misbehavior or Recklessness  Fail to
              Establish a Strong Inference of Scienter............................................................ 20

      C.     Plaintiffs' Scienter Allegations Fail under Tellabs ........................................... 25

II.    The Complaint Fails To Establish Loss Causation ...................................................... 29

III.   The Complaint Fails To Meet the Strict Pleading Requirements of Rule 9(b) and
      the PSLRA................................................................................................................. 31

      A.     The Complaint Fails To Allege with Particularity the  Facts on Which
              Plaintiffs' Belief Is Formed ............................................................................. 31

      B.     Plaintiffs Fail to Specify Why Defendants' Statements About GE's
              Financial Condition Were False and Misleading............................................... 32

      C.     Many of Defendants' Alleged Misstatements Are Merely Non-Actionable
              Statements of Corporate Optimism ................................................................... 33

      D.     Defendants Are Not Liable for Pre-Class Period Statements ............................ 34

IV.   The Complaint Fails To State a Claim Under Section 20(a)......................................... 34

CONCLUSION ................................................................................................................... 35

# TABLE OF AUTHORITIES

Acito v. IMCERA Group, Inc.,
    47 F.3d 47 (2d Cir. 1995) ................................................................................ 23

In re Alcatel Sec. Litig.,
    382 F. Supp. 2d 513 (S.D.N.Y. 2005) ............................................................. 32

In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453 (S.D.N.Y. 2008),
    aff'd sub nom. State Univs. Ret. Sys. of Il. v. AstraZeneca P.L.C., F. App'x 404 (2d
    Cir. 2009) ........................................................................................................ 17

Boguslavsky v. Kaplan,
    159 F.3d 715 (2d Cir. 1998) ............................................................................ 34

Chill v. Gen. Elec. Co.,
    101 F.3d 263 (2d Cir. 1996) ............................................................................ 16

City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,
    399 F.3d 651 (6th Cir. 2005) ........................................................................... 25

Denny v. Barber,
    576 F.2d 465 (2d Cir. 1978) ............................................................................ 24

Dura Pharms., Inc. v. Broudo,
    544 U.S. 336 (2005) ...................................................................................... 6, 29

ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase & Co.,
    553 F.3d 187 (2d Cir. 2009) ................................................................ 14, 18, 33

Fant v. Perelman,
    1999 WL 199078 (S.D.N.Y. Apr. 9, 2009) ..................................................... 23

Faulkner v. Beer,
    463 F.3d 130 (2d Cir. 2006) .............................................................................. 7

In re GeoPharma, Inc. Sec. Litig.,
    411 F. Supp. 2d 434 (S.D.N.Y. 2006) ............................................................. 26

In re GeoPharma, Inc. Sec. Litig.,
    399 F. Supp. 2d 432 (S.D.N.Y. 2005) ............................................................. 18

In re IBM Corp. Sec. Litig.,
    163 F.3d 102 (2d Cir. 1998) ............................................................................ 34

Institutional Investors Group v. Avaya, Inc.,
    564 F.3d 242 (3d Cir. 2009) ........................................................... 31

Kalnit v. Eichler,
    264 F.3d 131 (2d Cir. 2001) ......................................................14, 20

Lattanzio v. Deloitte & Touche L.L.P,
    476 F.3d 147 (2d Cir. 2007) ........................................................... 31

Lentill v. Merrill Lynch & Co.,
    396 F.3d 161 (2d Cir. 2005).........................................................29, 30

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
    568 F. Supp. 2d 349 (S.D.N.Y. 2008) .............................................. 29

In re NovaGold Res. Inc. Sec. Litig.,
    629 F. Supp. 2d 272 (S.D.N.Y. 2009) .............................................. 17

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000)........................................................20, 31

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004) ........................................................... 15

Rothman v. Gregor,
    220 F.3d 81 (2d Cir. 2000).............................................................. 18

Salinger v. Projectavision, Inc.,
    934 F. Supp. 1402 (S.D.N.Y. 1996) ................................................ 32

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,
    75 F.3d 801 (2d Cir. 1996)............................................................ 5, 17

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994).................................................13, 21, 24, 25

South Cherry St., L.L.C. v. Hennessee Group L.L.C.,
    573 F.3d 98 (2d Cir. 2009).............................................................. 14

Tabor v. Bodisen Biotech, Inc.,
    579 F. Supp. 2d 438 (S.D.N.Y. 2008) .............................................. 32

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
    531 F.3d 190 (2d Cir. 2008)........................................................5, 16, 20

In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510 (S.D.N.Y.), aff'd sub nom.
    Condra v. PXRE Group Ltd., 2009 WL 4893719 (2d Cir. Dec. 21, 2009) ...... 5, 7, 17, 18, 34

Tellabs, Inc. v. Makor Issues & Rights Ltd.,
    551 U.S. 308 (2007) ................................................................................. 4, 13, 14, 19, 25

In re Time Warner Inc. Sec. Litig.,
    9 F.3d 259 (2d Cir. 1993) .......................................................................................18, 19

In re Time Warner Inc. Sec. Litig., 794 F. Supp. 1252 (S.D.N.Y. 1992),
    aff'd in part and rev'd in part, 9 F.3d 259 (2d Cir. 1993) ................................................ 20

In re Vivendi Universal, S.A. Sec. Litig.,
    381 F. Supp. 2d 158 (S.D.N.Y. 2003) .......................................................................... 18

**Statutes & Rules:**

15 U.S.C. § 78u-4(b)(1) .................................................................................... 1, 13, 31, 32

Fed. R. Civ. P. 9(b) ................................................................................................1, 2, 31

Fed. R. Civ. P. 12(b)(6) ................................................................................................... 1

Sec. Offering Reform, Exchange Act Release No. 75,
    2005 WL 1692642 (July 19, 2005) ................................................................................ 10

**Other Authorities:**

Bloomberg Prof'l Servs. & Data Prods. (Bloomberg Finance L.P.) ..................................9, 10, 31

David I. Michaels, No Fraud? No Problem: Outside Director Liability for Shelf Offerings
    Under Section 11 of the Securities Act of 1933, 26 Ann. Rev. Banking & Fin. L.
    345, 378 (2007) ............................................................................................................ 11

David J. BenDaniel, Arthur H. Rosenbloom, and James J. Hanks Jr., International M&A,
    Joint Ventures, and Beyond: Doing the Deal, 269 (2d ed., Wiley, 2002) .......................... 12

Jeffrey Oakes and Iain MacNeil, Capital Raising: A Transatlantic Perspective,
    Capital Mkts. L.J. 1 (2009) ............................................................................................. 10

Joseph Kieran Leahy, What Due Diligence Dilemma? Re-Envisioning Underwriters'
    Continuous Due Diligence After WorldCom, Brooklyn Law School Legal Studies
    Paper No. 106 (2008) .................................................................................................. 10

Laurie Kulikowski, Wells Fargo Offering Disappoints Street,
    TheStreet.com, Nov. 11, 2008 ....................................................................................... 13

Lewis Carroll, *The Annotated Alice: Alice's Adventures in Wonderland & Through the Looking Glass* 251 (Martin Gardner ed., Bramhall House 1960) .................................... 5, 6

Lynn Cowan, <u>Stock Offerings Aim for 24-Hour Cycle</u>, Wall St. J., Mar. 16, 2009, at C3 .......................................................................... 11, 12, 21

MarketWatch, <u>Bank of America Prices $10 Bln Share Offer at $22 a Share</u>, marketwatch.com, Oct. 8, 2008, <u>available at</u> <u>http://www.marketwatch.com/story/story/print?guid=B4FC1024-BC8B-48E1-AB38-626B55D2FD28</u> (last visited January 15, 2010).................................................... 13

Paul Davis, <u>Capital's Available But It Will Cost You</u>, American Banker, Sept. 29, 2008.......... 12

Steven C. Johnson, <u>Dow Posts Record Point Drop as House Rejects Bailout</u>, Reuters, Sept. 29, 2008................................................................................................................... 9

Defendants General Electric Company ("GE"), Jeffrey R. Immelt, and Keith S. Sherin (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss with prejudice the second amended class action complaint (the "Second Amended Complaint" or "Complaint") under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P.") and under the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b) (the "PSLRA").

## PRELIMINARY STATEMENT

This is Plaintiffs' third failed attempt to state a securities fraud claim against Defendants.

At the pre-motion conference on April 1, 2009, held after Plaintiffs had already amended their complaint, the Court offered Plaintiffs the opportunity to amend yet again before Defendants moved to dismiss. Plaintiffs declined, stating: "[W]e are continuing our investigation, but at this moment <u>we don't have additional facts</u> that are going to change [the First Amended] complaint dramatically. <u>If we do get any new facts, I will apprise the Court immediately</u>, but at the moment we don't have any new facts." Exh. A, 4:2-6 (emphasis added).

The Court's invitation offered an opportunity to avoid putting an unfair and unnecessary burden on Defendants. As the Court explained:

> What I would rather not have happen is that we set a briefing schedule, we go through the briefing, midway through you file your amended complaint that addresses many of the arguments that were made in the opening brief. Exh. A, 3:19-22.

Nevertheless, Plaintiffs have now twice – first under cloak of their opposition memorandum and now in the Second Amended Complaint – burdened Defendants with the time, effort, and expense of responding to supposedly "new" facts that must have been known to

Plaintiffs before the April 1 pre-motion conference and that do not cure the defects of their First Amended Complaint.

The "new" facts first surfaced in Plaintiffs' opposition to Defendants' well-taken motion to dismiss, which showed that Plaintiffs failed to plead both scienter and loss causation and failed to meet the strict pleading requirements of Rule 9(b) and the PSLRA. After Defendants pointed out the impropriety of attempting to amend a complaint by opposition memorandum, the Court ordered Plaintiffs to submit a letter "indicating whether 'new facts' have indeed come to light that would warrant the filing of a second amended complaint." Exh. B, p. 2. On November 20, 2009, Plaintiffs submitted a letter listing 24 "new facts" that supposedly "were not included in the First Amended Complaint or that have come to light since its filing." Exh. C, p. 1. Plaintiffs never explained why they had failed to abide by their promise – for almost eight months – to apprise the Court immediately if they obtained any new facts.

But the explanation is apparent from the face of the new Complaint because even a cursory examination of Plaintiffs' "new" allegations confirms that they add nothing to Plaintiffs' previous, manifestly insufficient claims. Plaintiffs have not come forward with any new event, document, witness, or other piece of information that bears on their putative claims for relief. Instead, Plaintiffs have overloaded their Complaint with still more far-fetched lawyer-created surmises and conjectures that fail to support any viable ground for recovery and do not begin to satisfy the strict pleading requirements of Rule 9(b) or the PSLRA. Moreover, apart from three irrelevant allegations relating to Defendants' settlement of an unrelated SEC action in August 2009 – an action concerning accounting matters in 2002 and 2003 that have no relationship to this lawsuit – none of the allegedly "new facts" are new. All of them were available and known from publicly available sources well before Plaintiffs filed the First

Amended Complaint and then attended the April 1 pre-motion conference, at which they represented: "[W]e don't have any new facts."  Exh. A, 4:2-6.[1]

It thus comes as no surprise then that the central facts alleged in this third version of the complaint are unchanged from the previous version.  Throughout 2008, companies participating in the financial markets endured punishing volatility, uncertainty, and turmoil.  Compl. ¶¶ 28, 31, 33, 35, 39.  On September 25, 2008, GE announced plans to strengthen its capital base and liquidity position and held a conference call with securities analysts, during which GE's CEO, Jeffrey Immelt, and CFO, Keith Sherin, described their plans for responding to the tumultuous economic environment.  An analyst asked Mr. Immelt about the possibility of GE's issuing new equity, and Mr. Immelt responded, "we just don't see it right now."  Compl. ¶ 79.

Immediately after GE's September 25 announcement and analysts' call, the volatility and uncertainty in the financial markets increased, with the largest bank failure in U.S. history, the largest single-day drop in the Dow average, and Congress's rejection of a bailout bill.  In response, on October 1, 2008, GE announced that it would privately sell $3 billion in

---

[1] Aside from irrelevant allegations regarding the unrelated SEC settlement, the supposedly "new facts" included in the Second Amended Complaint are either (a) allegations relying on public sources that were readily available to Plaintiffs before filing their First Amended Complaint and attending the subsequent pre-motion conference, see, e.g., Compl. ¶ 10 n.2 (alleging the total size of the equity offering); Compl. ¶¶ 32, 40, 50, 58 (describing GE's stock prices at various times during September 2008); Compl. ¶ 86 (alleging analysts' actions after the September 25, 2008 conference call); Compl. ¶ 116 (relying on a January 23, 2009 press release); Compl. ¶ 138 (alleging that GE would need board approval for the equity offering); Compl. ¶ 139 n.10 (relying on a February 18, 2009 Form 10-K); Compl. ¶ 143 (relying on credit default swap data); or (b) not facts at all, but instead lawyer-created surmises or conjectures, devoid of factual support, that could have just as easily been included in the First Amended Complaint.  See, e.g., Compl. ¶¶ 105-06, 111, 148-56 (allegations relating to Berkshire Hathaway's investment and the pricing of the offering); Compl. ¶¶ 115-17 (allegations relating to GE's financial plan); Compl. ¶¶ 124-27 (allegations relating to the timing of the September 25, 2008 conference call); Compl. ¶ 139 (allegations relating to steps taken by underwriters).

preferred stock and warrants to Warren Buffett's Berkshire Hathaway and $12 billion in common stock to the public as additional steps to bolster GE's capital base and liquidity position and to further protect GE from the ever increasing market and economic uncertainties.

Likewise unchanged is the alleged ground for recovery.  Plaintiffs allege that Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, when, on September 25, 2008, Mr. Immelt responded to an analyst's question about the possibility of GE's issuing new equity by saying, "we just don't see it right now."  Ignoring the continued market deterioration and upheavals in the days immediately after Mr. Immelt's statement, Plaintiffs have drafted a complaint built on nothing more than fraud by hindsight.  With the same lack of factual support as their prior complaint, Plaintiffs conclude that Defendants must have known on September 25 that GE would conduct an offering and private sale on October 1, but lied to investors – knowing that their lie would be revealed a mere four business days later.  Facing a motion to dismiss establishing their failure to plead any cognizable motive for Defendants to engage in this conduct, Plaintiffs now allege in their Second Amended Complaint, without the requisite particularity or factual support, that Defendants concealed the equity offering because doing so would enable them to attract a lead investor whose presence would mitigate the dilutive effect of the stock offering.  Plaintiffs' efforts to recast their allegations, however, are unsuccessful.  Like its predecessor, the Second Amended Complaint does not state a claim for securities fraud and should be dismissed for several independent reasons:

1. *The Complaint Still Fails To Plead Scienter*.  Plaintiffs have not alleged facts giving rise to a "strong inference" that Defendants acted with scienter under either the Court of Appeals' two-pronged test or under <u>Tellabs, Inc. v. Makor Issues & Rights Ltd.</u>, 551 U.S. 308

(2007).[2]  In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 527-29 (S.D.N.Y.), aff'd sub

nom., Condra v. PXRE Group, Ltd., 2009 WL 4893719 (2d Cir. Dec. 21, 2009).

Not only did Plaintiffs concede at the pre-motion conference that neither Mr.

Immelt nor Mr. Sherin benefited in some concrete and personal way from the purported fraud

and thus lack any motive, but the motive theories advanced by Plaintiffs – the desire to maintain

GE's credit rating in order to facilitate the offering and to avoid dilution from GE's stock

offering – also amount to nothing more than generalized motive pleadings that fail under well-

settled Second Circuit law.  See, e.g., San Leandro Emergency Med. Group Profit Sharing Plan

v. Philip Morris Cos., 75 F.3d 801, 814 (2d Cir. 1996).

Plaintiffs' attempts to establish circumstantial evidence of Defendants' conscious

misbehavior or recklessness fare no better.  To show conscious misbehavior or recklessness, a

plaintiff must "specifically identify the reports or statements containing" information

demonstrating that Defendants knew or should have known that their public statements were

false when made.  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,

531 F.3d 190, 196 (2d Cir. 2008).  Plaintiffs have failed to do so.

Plaintiffs' scienter allegations also fail under Tellabs.  Subscribing to Plaintiffs'

allegations requires, to borrow a line from *Alice in Wonderland*, believing as many as six

impossible things[3]:  (1) that GE lied on September 25, knowing that its lie would be exposed a

---

[2] Unless otherwise indicated, all internal quotations and citations are omitted.

[3]     "I can't believe *that!*" said Alice.
        "Can't you?" the Queen said in a pitying tone.  "Try again: draw a long breath, and shut
        your eyes."
        Alice laughed.  "There's no use trying," she said: "one *can't* believe impossible things."
        "I daresay you haven't had much practice," said the Queen.  "When I was your age,
        I always did it for half-an-hour a day.  Why, sometimes I've believed as many as six
        impossible things before breakfast."

mere four days later when the offering was announced; (2) that not only did Mr. Immelt lie, but (3) GE's independent directors, (4) scores of Goldman Sachs employees, and (5) inside and outside counsel first acquiesced in that lie and then all joined in filing a false registration statement with the SEC; and (6) that Mr. Buffett, the world's most astute investor whose integrity is legendary, would invest $3 billion in GE when its CEO had only days before lied to the public.  The much more credible inference is that the unprecedented market volatility and deteriorating economic situation after September 25 led GE to reevaluate its plans and safeguard its capital base and liquidity through the offering.

Moreover, Plaintiffs' "new" attempt to supply motive – that Defendants concealed the offering to attract an investor like Mr. Buffett in order to minimize the dilutive effect of the offering – is merely a reiteration of their earlier motive argument, lacks the requisite particularity, and also contradicts the efficient market principles elsewhere embraced by Plaintiffs.  Plaintiffs cannot explain why news of Mr. Buffett's investment would have a positive effect on GE's stock price only if announced simultaneously with the announcement of the equity offering.  See Compl. ¶ 150.  The far more compelling inference, and the only one consistent with Plaintiffs' efficient market principles, is that the market would immediately factor into GE's stock price the news of Mr. Buffett's investment, regardless of whether it was announced simultaneously with the equity offering, or a few days later.

2.  *The Complaint Still Fails To Plead Loss Causation.*  To state a claim under Section 10(b), a plaintiff must allege "loss causation" – "a causal connection between the material misrepresentation and the loss."  Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 342 (2005).  Here, the purported misrepresentation was that GE was not planning an equity offering.

---

Lewis Carroll, *The Annotated Alice: Alice's Adventures in Wonderland & Through the Looking Glass* 251 (Martin Gardner ed., Bramhall House 1960).

Yet Plaintiffs do not claim that they suffered any loss when the supposedly concealed offering was disclosed – nor could they, because when GE announced the offering, along with Mr. Buffett's investment on October 1, its stock price rose.  Instead, Plaintiffs claim to have suffered a loss on October 2, when the pricing of the equity offering was disclosed.  But Plaintiffs have never alleged that the pricing of the offering – which, as Plaintiffs admit, is set just before an offering takes place, see Compl. ¶ 147 – was even known, let alone fraudulently concealed, on September 25.

      3.  *The Complaint Still Fails To Plead a Section 20(a) Claim*.  Finally, because Plaintiffs have failed to plead any underlying federal securities claim, Plaintiffs have failed to plead a "controlling person" claim against either Mr. Immelt or Mr. Sherin under Section 20(a) of the Exchange Act.

      The Complaint should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS

      GE is a New York corporation that serves customers in 100 countries and employs more than 300,000 people worldwide.  Over the years, GE has experienced extraordinary financial success.  For fiscal year 2007, GE reported $173 billion in total revenue and $22 billion in earnings.  Compl. ¶ 18.[4]

---

[4] All the facts set forth below are drawn from the Complaint or documents integral to the Complaint or are facts of which judicial notice may properly be taken.  As this Court recently stated, "consideration of materials outside the complaint is permissible on a 12(b)(6) motion if the documents are integral to the complaint, it is clear on the record that no dispute exists regarding the authenticity or accuracy of the document, and the relevance of the document is undisputed." In re PXRE Group, Ltd. Sec. Litig., 600 F. Supp. 2d 510, 518 n.9 (S.D.N.Y. 2009) (quoting Faulkner v. Beer, 463 F.3d 130, 134 (2d Cir. 2006)).

### A.    Market Conditions Deteriorate in September 2008

September 2008 was a month like no other in the financial markets.  On September 7, 2008, the federal government seized control of Fannie Mae and Freddie Mac to avert their financial collapse.  Compl. ¶ 28.  From September 9 through September 11, 2008, American International Group ("AIG") experienced a sharp drop in its stock price as investors lost confidence in the company.  Compl. ¶ 29.  On September 15, 2008, Lehman Brothers filed for bankruptcy protection – the largest bankruptcy in U.S. history.  Compl. ¶ 35.  On September 17, 2009, the U.S. government announced that it would provide AIG with $85 billion in return for an 80% stake to prevent AIG's financial collapse and the possible widespread impact that would have.  Compl. ¶ 39.  On September 19, 2008, the U.S. Treasury Department, recognizing the risks of allowing investor fear to continue to paralyze the markets, announced plans for a sweeping $700 billion bailout of the banking and financial industries.

### B.    GE's Statements During the Class Period

Responding to the events in the financial markets, on September 25, 2008, GE announced steps that it planned to take to "strengthen its already strong capital and liquidity position."  These steps included:  increasing capital in GE Capital; reducing GE Capital's dependence on commercial paper; and "[r]esizing GE to deliver 60%/40% industrial-financial services earnings split by the end of 2009."  Exh. D, p. 1;  Compl. ¶ 62.  GE further stated that "GE Capital does not need to raise any additional long-term debt for the remainder of 2008."  Exh. D, p. 1; Compl. ¶ 62.

Also on September 25, GE held a conference call with analysts, during which Mr. Immelt stressed the importance of taking "proactive steps to be even safer in this environment."

In response to an analyst's question about the possibility of issuing new equity, Mr. Immelt stated, "we just don't see it right now":

> *<Jeffrey Sprague>* And then just finally, Jeff, is the idea of any new equity still off the table? Someone like a Mubadala all of a sudden does some new equity as opposed to buying the stock in the new market. Is that type of thing open for discussion in any type of permutation -- maybe not just them but others?
>
> *<Jeffrey Immelt>* Jeff, we just don't see it right now. Again, we feel very secure about how the funding looks and strength of the Company and the strength of the balance sheet. Cash flows are great, liquidity profile has been strong, is now stronger. Leverage is better. And so we really believe in our business model and feel kind of secure that we're well-positioned here.

Exh. E, p. 8; Compl. ¶ 79.

GE's stock price rose on September 25, 2008 from an opening price of $23.66 and closed at $25.68 per share.[5]

### C.    Accelerating Volatility, Uncertainty, and Turmoil

Within hours of GE's September 25 analysts' call, governmental regulators seized Washington Mutual Inc. and sold its branches and assets to JPMorgan Chase & Co. in "the biggest U.S. bank failure in history." Compl. ¶ 93. On September 26, Congress appeared stalemated over a proposed $700 billion bailout package. Over the weekend of September 27 and 28, Congress debated, and vacillated over passing, the bailout package. On September 29, the U.S. stock market plunged after the House rejected the $700 billion bailout package. The Dow Jones Industrial Average fell 778 points – its largest one-day point drop ever.[6] The S&P 500 similarly had its worst day since 1987, experiencing an 8.8% drop. Compl. ¶ 96. GE's stock dropped $2.15 per share, or 8.5%, that day. Id. The next day, September 30, the U.S.

---

[5] GE Sept. 25, 2008 Prices, Bloomberg Prof'l Servs. & Data Prods. (Bloomberg Finance L.P.). The Complaint erroneously states that GE's stock price opened at $23.53 and closed at $26.08 on September 25, 2008. Compl. ¶ 90.

[6] Steven C. Johnson, Dow Suffers Record Point Drop as House Rejects Bailout, Reuters, Sept. 29, 2008.

stock market rebounded on reports that Congress would agree on the bailout package. GE's stock rose 10.4%, closing at $25.25. Compl. ¶ 97.

At 1:42 p.m. on October 1, GE's stock was trading at $23.63 when trading was halted for an impending company announcement.[7] GE then "announced plans to offer at least $12 billion of common stock to the public" and "to sell $3 billion of perpetual preferred stock in a private offering to Berkshire Hathaway, Inc." Exh. F, p. 1; Compl. ¶ 102. Berkshire Hathaway also received "warrants to purchase $3 [billion] of common stock with a strike price of $22.25 [per] share," exercisable over five years. Compl. ¶ 120. GE's stock price rose on the announcement from $23.63 and closed at $24.50.[8]

Also on October 1, 2008, GE filed a preliminary prospectus supplement to its December 5, 2005 shelf prospectus, detailing its plan to conduct the $12 billion equity offering under a "'shelf' registration statement." Exh. G, p. 3; Compl. ¶ 130 & n.8. The SEC designed the shelf registration rules to give "well-known seasoned issuers" ("WKSIs") like GE immediate access to the capital markets and "the flexibility to take advantage of market windows . . . in response to changing market conditions."[9] This is precisely what GE did.

---

[7] GE Oct. 1, 2008 Prices, Bloomberg Prof'l Servs. & Data Prods. (Bloomberg Finance L.P.); Compl. ¶ 101.

[8] Bloomberg, supra note 5.

[9] Securities Offering Reform, Exchange Act Release No. 75, 2005 WL 1692642, at *92 (July 19, 2005). "'[A]utomatic' registration for WKSIs means instantaneous offerings by WKSIs." Joseph Kieran Leahy, What Due Diligence Dilemma? Re-Envisioning Underwriters' Continuous Due Diligence After WorldCom, Brooklyn Law School Legal Studies Paper No. 106, at 15, 18-19, 37 (Oct. 2008) ("[A]n issuer can take down a shelf-registered offering fast – in as little as a few hours" while "underwriters ha[ve] days or less" to perform due diligence.) (emphasis in original); see also Jeffrey Oakes & Iain MacNeil, Capital Raising: A Transatlantic Perspective, Capital Mkts. L.J. 1, 4-5 (2009) ("[S]helf registration allows an issuer to access the market at any time and on extremely short notice, often as little as a few hours, without any further SEC review.").

As Plaintiffs have admitted, under a shelf takedown "it was entirely possible for GE to market and price the equity transactions in only 24 hours." Exh. H, p. 3. Indeed, GE was hardly alone in availing itself of this procedure. As the Wall Street Journal reported, in 2008 and 2009, the number of companies using shelf takedowns to market and price stock within 24 hours surged from previous years to avoid exposure to volatile markets.[10] As one commentator explained: "Shelf offerings (or shelf takedowns) . . . are truly high velocity transactions. Assuming that no post-effective amendment [is] needed, the issuer [can] decide that the time [is] ripe for [a] takedown, obtain bids from underwriters and sell the securities, all within a day or two."[11]

> GE's preliminary prospectus stated:
>
> In light of continuing volatility and developments in the financial markets since September 25, including uncertainty as to if, when and in what form the U.S. government's proposed Emergency Economic Stabilization Act of 2008 (the "EESA") will be enacted, we are seeking through this offering to accelerate our plan to enhance our capital base and liquidity position. The net proceeds of the offering and the Berkshire Investment will give us additional flexibility in the event of further deterioration in the commercial paper and other credit markets.

Exh. G, p. S-2.

---

[10] In 2009, 62% of "follow-on" stock offerings like GE's were "marketed and priced within 24 hours," while 52% were done in a 24-hour window in 2008, because the "increased pricing risk associated with unstable stock markets" makes accelerated offerings "the go-to method now." Lynn Cowan, Stock Offerings Aim for 24-Hour Cycle, Wall St. J., Mar. 16, 2009, at C3.

[11] David I. Michaels, No Fraud? No Problem:  Outside Director Liability for Shelf Offerings Under Section 11 of the Securities Act of 1933, 26 Ann. Rev. Banking & Fin. L. 345, 378 (2007) (emphasis in original). Plaintiffs have criticized Defendants' citation of articles from the Wall Street Journal and other reputable sources in connection with a motion to dismiss. But Plaintiffs are unable to offer a single authority contradicting the articles and do not controvert them in any way.

On October 1, 2008, GE stock closed at $24.50, up four percent after the announcement of the equity offering and the terms – including the price – of the Berkshire Hathaway sale.[12]

**D.**    **GE's Pricing of the Public Offering on October 2, 2008**

As Plaintiffs acknowledge, pricing for a shelf takedown is set immediately before the shares are sold to the market. See Compl. ¶ 147.[13]  On October 2, 2008, GE priced 547,825,000 shares of common stock at $22.25 per share, a 9.18% discount from GE's closing price of $24.50 on October 1, 2008 (Compl. ¶ 107), and a 6% discount from GE's trading price on October 1 immediately before the offering was announced.  The public offering price of $22.25 was the same as the exercise price, announced on October 1, of the Berkshire Hathaway warrants, i.e., the stock was offered to the public at the same price as Berkshire Hathaway could obtain by exercising its warrants.

GE's discount comported with market norms, as the "price discount on shares sold [in a shelf takedown] is larger than with traditional" offerings.  Lynn Cowan, Stock Offerings Aim for 24-Hour Cycle, Wall St. J., Mar. 16, 2009, at C3.  For example, in the week before GE's offering, JPMorgan Chase priced an offering at a 6.8% discount, Capital One priced at an 8.9% discount, and First Niagara priced at a 14% discount.[14]  In the days after GE's

---

[12] Bloomberg, supra note 5.

[13] See also Exh. I; David J. BenDaniel, Arthur H. Rosenbloom, and James J. Hanks Jr., International M&A, Joint Ventures, and Beyond: Doing the Deal, 269 (2d ed., Wiley, 2002) ("The price is not fixed until just before the offering is made to the public. . . .").

[14] Paul Davis, Capital's Available, But It Will Cost You, American Banker, Sept. 29, 2008.

offering, Bank of America priced an offering at a 32% discount.[15]  Wells Fargo priced in early

November at a 14.8% discount.[16]

      Also on October 2, 2008, GE filed its final prospectus for the sale of the equity

offering.  The final prospectus repeated the explanation in the preliminary prospectus regarding

the reasons for the offering.[17]

**ARGUMENT**

## I.     THE COMPLAINT FAILS TO ALLEGE FACTS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER

      To plead a violation of Section 10(b) and Rule 10b-5, the PSLRA requires a

plaintiff to "state with particularity facts giving rise to a strong inference" that the defendant

acted with the requisite scienter.  15 U.S.C. § 78u-4(b)(2).

      The Second Circuit has long recognized that a plaintiff can establish the requisite

"strong inference" of scienter:  "either (a) by alleging facts to show that defendants had both

motive and opportunity to commit fraud or (b) by alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  Shields v. Citytrust Bancorp,

Inc., 25 F.3d 1124, 1128 (2d Cir. 1994).

      The Supreme Court recently clarified the PSLRA's "heightened pleading

instructions" and the "strong inference" standard.  Tellabs, Inc. v. Makor Issues & Rights Ltd.,

551 U.S. 308, 321 (2007).  "To meet the 'strong inference' standard, it is not sufficient to set out

---

[15] MarketWatch, Bank of America Prices $10 Bln Share Offer at $22 a Share, marketwatch.com, Oct. 8, 2008, available at http://www.marketwatch.com/story/story/print?guid=B4FC1024-BC8B-48E1-AB38-626B55D2FD28 (last visited January 15, 2010).

[16] Laurie Kulikowski, Wells Fargo Offering Disappoints Street, TheStreet.com, Nov. 11, 2008.

[17] Exh. J, pp. S-2, S-8;  see supra p. 11 (quoting GE's explanations from the preliminary prospectus).

'facts from which, if true, a reasonable person <u>could</u> infer that the defendant acted with the required intent' for that gauge 'does not capture the stricter demand Congress sought to convey in [the PSLRA].'" <u>South Cherry St., L.L.C. v. Hennessee Group L.L.C.</u>, 573 F.3d 98, 110-11 (2d Cir. 2009) (quoting <u>Tellabs</u>, 551 U.S. at 314). Rather, to qualify as "strong" under <u>Tellabs</u>, "an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." <u>Tellabs</u>, 551 U.S. at 314. Thus, to determine whether a plaintiff's scienter allegations are sufficient, a court "must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." <u>Id.</u>

Plaintiffs have failed to plead a "strong inference" of scienter, both under the Second Circuit's two-pronged test and under <u>Tellabs</u>. Accordingly, the Complaint should be dismissed.

A.    **Plaintiffs' Allegations of Motive and Opportunity Fail**

To raise the requisite strong inference of scienter through motive and opportunity to commit fraud, a plaintiff must allege that the defendants "benefited in some concrete and personal way from the purported fraud." <u>ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198 (2d Cir. 2009). "Motives that are generally possessed by most corporate directors and officers do not suffice." <u>Kalnit v. Eichler</u>, 264 F.3d 131, 139 (2d Cir. 2001).[18]

Plaintiffs' core allegation is that GE's Chairman and CEO, Mr. Immelt, lied during a September 25, 2008 conference call with securities analysts when, in response to a

---

[18] "Rather, the 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit," the classic insider trading situation. <u>ECA</u>, 553 F.3d at 198-99.

question about issuing new equity, he said, "we just don't see it right now." Plaintiffs allege, as they did in their First Amended Complaint, that GE's executives were motivated to mislead investors to prevent dilution of GE's stock. Compl. ¶ 148, 156-57. In response to Defendants' demonstration that this core motive allegation does not survive the PSLRA or governing case law, Plaintiffs now attempt to prop up their Complaint with "new allegations": Defendants were motivated to lie about GE's intention to issue new equity in order to maintain GE's "stock price, increasing its ability to attract a lead investor such as Berkshire Hathaway," and Defendants hoped that announcing the "negative news of the public offering with the positive news of Warren Buffett's participation" would minimize any decrease in GE's stock price because of the announcement of the offering. Compl. ¶¶ 149, 150-51. Plaintiffs further allege that GE's executives lied because announcing the offering on September 25 would have "made pricing for the offering much softer" and that concealing the offering allegedly "save[d]" GE at least $1.7 billion. Compl. ¶¶ 156-57. But these allegations offer no new motive; instead, they amount to a repackaged general allegation that Defendants were motivated to avoid dilution of GE's stock.

Accordingly, the Complaint fails to allege any concrete and personal benefit to the individual Defendants, as Plaintiffs freely conceded at the April 1, 2009 pre-motion conference: "[T]he motive would not be to benefit these individuals personally. I don't think Mr. Immelt or Mr. Sherin had any [motive] outside of their role as CEO and CFO of this company. It was to benefit the company." Exh. A, 6:11-14. But the Second Circuit has made it unmistakably clear that a generalized motive to confer corporate benefits, as Plaintiffs concededly allege here, is insufficient to establish scienter. See, e.g., Rombach v. Chang, 355 F.3d 164, 177 (2d Cir. 2004) (holding that plaintiffs failed to allege scienter where the asserted motive was "part of the officers' and directors' financial responsibilities to the company" and

plaintiffs "nowhere allege that defendants engaged in these transactions to secure personal gain"). Plaintiffs' failure to allege a concrete and personal benefit is fatal to their motive allegations regarding not only the individual Defendants but GE as well.  When the defendant is a corporation, "the pleaded facts must create an inference that someone whose intent could be imputed to the corporation acted with the requisite scienter."  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 195 (2d Cir. 2008).  Plaintiffs cannot satisfy this requirement here.  They have conceded that neither Mr. Immelt nor Mr. Sherin acted with the requisite motive, and they have identified no one else who did whose intent could be imputed to GE.

Thus, not surprisingly, motive allegations indistinguishable from those here have repeatedly been rejected as insufficient to establish scienter on the part of corporate defendants. For example, to support their core allegation that Defendants were motivated to avoid dilution, Plaintiffs allege that Defendants concealed the equity offering to maintain the appearance of financial strength during a tumultuous economic period and avoid downward pressure on GE's stock.  See Compl. ¶ 141 (asserting that Defendants sought to "quell investors' anxieties concerning GE's liquidity, capital strength and potential equity dilution" because "[n]ews that GE was in need of capital to maintain its Triple A rating would have stoked fear in an already volatile market for GE securities").  But the Second Circuit rejected this theory in Chill v. Gen. Elec. Co., 101 F.3d 263, 268 (2d Cir. 1996) ("[T]he motive to maintain the appearance of corporate profitability . . . will naturally involve a benefit to a corporation, but does not entail concrete benefits.").  Plaintiffs also support their core allegation by alleging that Defendants were motivated to "allay investors' concerns about GE's financial condition because further market uncertainty would . . . limit[] GE's financing operations, hampering its ability to borrow

funds" and increase "the cost for GE to replace its borrowings." Compl. ¶¶ 143, 145.[19] But the Second Circuit held such motive allegations insufficient in <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 813 (2d Cir. 1996), where plaintiffs alleged that defendants inflated stock prices in order to "maximize the marketability" of debt securities and to "minimize the interest rate on those securities."

Similarly, several Courts in this District have recently rejected the notion that an anti-dilution motive such as Plaintiffs' central motive allegation suffices to raise a strong inference of scienter. In <u>In re NovaGold Res. Inc. Sec. Litig.</u>, 629 F. Supp. 2d 272, 304 n.24 (S.D.N.Y. 2009), Judge Cote held that a motive to "keep the stock price high to minimize the dilution of NovaGold's stock price in [a] secondary offering" was too generalized to constitute a cognizable motive theory, "as any company issuing new shares of stock could be deemed to be acting with scienter." Likewise, this Court, in <u>In re PXRE Group, Ltd., Sec. Litig.</u>, 600 F. Supp. 2d 510, 532 (S.D.N.Y.), <u>aff'd sub nom.</u>, <u>Condra v. PXRE Group, Ltd.</u>, 2009 WL 4893719 (2d Cir. Dec. 21, 2009), held that the "alleged motivation of a corporation to raise money to prevent the negative ramifications of a resultant drop of a credit rating or a stock price . . . is far too generalized (and generalizable) to allege the proper 'concrete and personal' benefit required by the Second Circuit." This Court recognized that if scienter could sufficiently be pleaded generally alleging that a company was motivated to raise capital, "virtually any company that attempted to raise capital, especially in a woeful economic climate, would face specious securities fraud allegations." <u>Id.</u> at 533. Likewise, Judge Griesa, in <u>In re AstraZeneca Sec. Litig.</u>, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008), <u>aff'd sub nom.</u>, <u>State Univs. Ret. Sys. of Ill. v.</u>

---

[19] <u>See also</u> Compl. ¶ 144 (alleging that "to protect the Triple A rating, Defendants were highly motivated to convince the financial markets that, despite the turmoil, GE's capital base and liquidity positions were strong and it had no need to raise additional capital").

AstraZeneca P.L.C., 334 F. App'x 404 (2d Cir. June 25, 2009), held that an alleged motive to artificially inflate the company's stock price to complete a stock offering at a higher price – essentially the same motive theory advanced here – was insufficient because it was "just an example of a generalized motive that any officer or director who desires to operate a successful company will have."

Nor does the Second Circuit's decision in In re Time Warner Inc. Sec. Litig., 9 F.3d 259 (2d Cir. 1993), help Plaintiffs, for several reasons. First, the Second Circuit has sharply cabined Time Warner. In Rothman v. Gregor, 220 F.3d 81, 93 (2d Cir. 2000), the Court cited Time Warner for the proposition that "in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." (emphasis added). Courts, including this one, have consistently understood this passage in Rothman and subsequent cases to "limit Time Warner's reach to the alleged 'desire to carry out corporate acquisitions,'" a motive not alleged here. PXRE, 600 F. Supp. 2d at 532 n.24; see also In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 450 (S.D.N.Y. 2005) ("[P]laintiffs read these cases too broadly – they are in fact limited to the desire to carry out corporate acquisitions."); In re Vivendi Universal, S.A. Sec. Litig., 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003) ("Scienter may be imputed . . . to defendants when [defendants] were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices."). These are the "circumstances" identified in Rothman – circumstances not present here. Moreover, even within the acquisitions context, courts do not slavishly apply Time Warner to find complaints sufficient, but instead conduct an "extremely contextual" inquiry. ECA, 553 F.3d at 201 n.6. For the reasons explained in this memorandum,

Plaintiffs' claims would not survive such a searching inquiry, even if the reach of Time Warner were not so plainly circumscribed.

Second, the holding in Time Warner resulted from the application of a far less rigorous pleading standard than the strong inference of scienter now required by the PSLRA and Tellabs. In Time Warner, the Court recognized that whether plaintiffs had sufficiently pleaded motive was "a close question." Time Warner, 9 F.3d at 269. Although acknowledging that defendants' arguments were strong, the Court allowed plaintiffs to proceed only because defendants' contentions of non-fraudulent intent were "insufficient to preclude all possibility" that motive existed. Id.[20] Tellabs and the PSLRA now require a stronger showing by Plaintiffs to establish a strong inference of scienter – a burden they have three times shown they are unable to meet. See Tellabs, 551 U.S. at 324 ("[T]he inference of scienter must be more than merely 'reasonable' or 'permissible.'"). The Second Circuit's reasoning in Time Warner therefore does not survive Tellabs.

Third, in Time Warner, allegations that defendants had not disclosed their active consideration of a rights offering were insufficient on their own to establish motive, see 9 F.3d at 269-70. Instead, Time Warner held that "the combination of the glowing reports of potential strategic alliances and then nondisclosure of the active consideration of a rights offering" led to the "arguable" or "possible" inference of a motive to commit fraud. Id. at 269.[21] Plaintiffs here have not alleged anything beyond Defendants' concealing plans to conduct an equity offering.

---

[20] See also Time Warner, 9 F.3d at 269 (Defendant's statements "arguably became misleading."); id. at 270 ("[W]e think that a motive theory emerges with reasonable possibilities."); id. ("[I]t is arguable" that defendants acted with sufficient motive).

[21] Indeed, in Time Warner, the misleading statements regarding the acquisition prospects were essential to the viability of plaintiffs' motive theory: overstating acquisition prospects allowed defendants to benefit from the alleged scheme by setting a price higher "than would have been possible" without those overstatements. 9 F.3d at 269.

Furthermore, the stock offering in <u>Time Warner</u> involved "substantial dilution" of approximately 60%, not the 6% alleged here.  <u>See</u> <u>In re Time Warner Inc. Sec. Litig.</u>, 794 F. Supp. 1252, 1254 (S.D.N.Y. 1992), <u>aff'd in part and rev'd in part</u>, 9 F.3d 259 (2d Cir. 1993) (when defendant announced its 34.5 million share offering, it had 57.8 million shares million shares outstanding); Exh J, S-9, S-14 (GE offered 547,825,000 shares and had 9,948,028,000 shares outstanding). <u>Time Warner</u> therefore does not support the sufficiency of Plaintiffs' allegations.

### B.    Plaintiffs' Allegations of Conscious Misbehavior or Recklessness Fail to Establish a Strong Inference of Scienter

To establish scienter through circumstantial evidence of Defendants' conscious misbehavior or recklessness, Plaintiffs must plead particularized facts that raise a strong inference that Defendants engaged in "deliberate illegal behavior" or "highly unreasonable" conduct representing "an extreme departure from standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." <u>Novak v. Kasaks</u>, 216 F.3d 300, 308 (2d Cir. 2000).  When plaintiffs contend that defendants "knew facts or had access to information suggesting that their public statements were not accurate," plaintiffs must "specifically identify the reports or statements containing this information." <u>Dynex</u>, 531 F.3d at 196.  Further, where, as here, plaintiffs have not sufficiently alleged that defendants had a motive or opportunity to commit fraud, "it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." <u>Kalnit</u>, 264 F.3d at 142.

Plaintiffs allege that GE executives misrepresented the financial health of the company and lied about the company's intention to issue new equity during the September 25 conference call.  But Plaintiffs cite no contemporaneous document or report or any particularized

fact demonstrating GE executives' conscious misbehavior or recklessness.  Thus, for several

reasons, Plaintiffs' allegations do not demonstrate "strong circumstantial evidence" of

Defendants' "conscious misbehavior or recklessness" and fail to establish a strong inference of

scienter.  Shields, 25 F.3d at 1128.

           First, Plaintiffs allege that GE priced the public offering at a discount to market

because, in contrast to GE's "supremely confident" September 25 statements, GE was "in a

distressed financial condition."  Compl. ¶¶ 113-14.  This conclusory allegation, devoid of any

factual support, not only is insufficient to constitute strong circumstantial evidence of conscious

misbehavior or recklessness, but also conflicts with market norms and with Plaintiffs' other

allegations.  It is generally the case that the "price discount on shares sold [in a shelf-takedown]

is larger than with traditional" offerings.  Lynn Cowan, supra, at C3.  Additionally, Plaintiffs

concede that a price discount on any comparable equity offering at the time was inevitable,

driven by prevailing chaotic market conditions, not factors unique to GE's financial condition:

"under the difficult current market conditions at the time a huge $12 billion offering would have

to be priced at a substantial discount to current market price."  Compl. ¶ 111.  The facts bear this

out:  a review of sizeable contemporaneous follow-on offerings shows that GE's discount

comported with market norms.  See supra, pp. 12-13.  In addition, Plaintiffs ignore that the

offering price was influenced by the exercise price of Berkshire Hathaway's warrants,

announced on October 1.  And, in any event, the fact that an extremely astute investor like Mr.

Buffett decided to invest $3 billion in GE strongly contradicts any inference that GE was in a

distressed financial state.  More compelling is the inference that Mr. Buffett's investment was a

sign of GE's long-term financial stability and, in fact, this is the very inference Plaintiffs

elsewhere allege the market drew from news of Mr. Buffett's involvement – the "Buffett Premium."

Second, Plaintiffs allege that GE's decision to hold a conference call on September 25 to announce revised earnings estimates demonstrates that it was planning an equity offering because holding the call was necessary "to comply with disclosure requirements in advance of the offerings."  Compl. ¶¶ 124-26.  Again, Plaintiffs cite no contemporaneous documents, confidential witnesses, or any internal memoranda or reports to support this allegation.  Moreover, this allegation directly contradicts Plaintiffs' other allegations, including that "GE scheduled the September 25th conference call in response to the extraordinary carnage in world financial markets to reassure investors of GE's strength and ability to weather the financial storm pounding the markets."  Compl. ¶ 65.  Furthermore, the allegation that GE scheduled its conference call only in anticipation of a planned equity offering relies on the incredible inference that Defendants would simultaneously act to avoid liability for non-disclosure of revised earnings estimates, while knowingly incurring liability for non-disclosure of a planned equity offering.  The only sensible, and much more cogent and compelling inference, is the one Plaintiffs also cite – that the conference call was intended to bolster investor confidence.  This is, in fact, the only inference consistent with the balance of Plaintiffs' other allegations.[22]

Third, Plaintiffs allege that the equity offering must have been planned by the time of the September 25 conference call because only four business days elapsed between the

---

[22] See, e.g., Compl. ¶ 58 ("As investors continued to flee financial stocks, on September 23, GE's stock price closed down 4.6% from the prior day's trading"); Compl. ¶ 60 ("As a result of the back-to-back failures of the nation's mightiest financial institutions, fear was rampant; the United States financial markets were undergoing unprecedented financial turmoil and uncertainty in September 2008.").

call and the October 1 announcement of the offering.  See Compl. ¶¶ 136-40.  In particular, the

Complaint asserts that it is "improbable" that "GE was able to obtain board approval, complete

due diligence, and draft and negotiate all of the required legal documentation for their $15 billion

in offerings in 48 hours."  Id. ¶ 140.  But this is an unsupported conclusory allegation – Plaintiffs

point to no authority establishing how long these preparatory steps take in practice.  See Fant v.

Perelman, 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 2009) ("[T]emporal proximity alone does

not raise a circumstantial inference of fraud.") (citing Acito v. IMCERA Group, Inc., 47 F.3d 47,

53 (2d Cir. 1995)).  The vacuum of particularized facts in the Complaint supporting this

allegation stands in contrast to the many facts supporting the contrary – and much more cogent

and compelling – inference.  The SEC designed the shelf takedown rules to give well-known

seasoned issuers like GE immediate access to capital markets;[23] as Plaintiffs themselves allege,

shelf takedowns are designed to be commenced, priced, and closed in a day.  See Compl. ¶ 153.

Moreover, Plaintiffs ignore that in selecting Goldman Sachs as its underwriter, GE selected a

firm not only having a long relationship with GE and a deep familiarity with its finances, but also

a firm that had, just weeks earlier, done due diligence in connection with underwriting $100

million of General Electric Capital Corporation's senior unsecured rate notes.  Exh. K, pp. 2-3.

And Plaintiffs acknowledge the significance of GE Capital to GE:  "GE Capital[,] which is a

financial institution[,] comprised more than 75% of the assets on GE's balance sheet."

Compl. ¶ 139 n.10.  Additionally, GE's bylaws provide that special meetings of the Board may

be held anytime and that directors may participate by telephone.[24]  Exh. M, p. 3.

---

[23] See supra, pp. 10-11.

[24] Plaintiffs make the unsupported conclusory allegation that drafting the preliminary prospectus
would require "more than a day." But, 26 pages of the 47-page preliminary prospectus that GE
filed on October 1, 2008 are identical to those in the GE prospectus filed on December 5, 2005 as
part of a shelf registration statement and used in a GE notes offering on November 30, 2007.

Fourth, Plaintiffs allege that subsequent events demonstrate that GE never could have achieved its financial plan announced on September 25 without the funds raised in the offerings, and so GE's executives must have planned the equity offering all along. Compl. ¶ 115. In particular, a January 23, 2009 press release, Plaintiffs allege, "shows that Defendants' September 25 statement that GE could meet its liquidity plan without raising new debt or equity was knowingly false." Compl. ¶¶ 116-17. These allegations are a classic attempt to plead "fraud by hindsight," which courts have soundly rejected as sufficient to sustain a complaint. See Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978).

Finally, Plaintiffs allege that Defendants' "pattern of making statements that are soon proven false by their actions and subsequent statements," and their "habit of blaming their misstatements on unpredictable market conditions . . . raises a strong inference that Defendants' September 25th statements were not innocent mistakes; rather Defendants' misstatements evidence conscious misbehavior or recklessness." Compl. ¶ 202; see also id. ¶¶ 180-201. These contentions cannot establish scienter. See Shields, 25 F.3d at 1129 (holding that "misguided optimism is not a cause of action"). At most, these allegations show GE executives' difficulty in predicting financial results in what Plaintiffs concede were tumultuous and volatile (i.e., hard-to-predict) economic times. Plaintiffs do not suggest that Defendants engaged in conscious misbehavior or recklessness in making the prior statements, and there is no factual basis for

---

Exh. G, pp. 1-26; Exh. L, pp. 1-26. Three additional pages are also substantially similar to the information in the notes offering on November 30, 2007, with only minor changes. Compare Exh. G, pp. S-ii, S-iii, S-18 with Exh. L, pp. i, S-1, S-16. The 18 remaining pages, many of which are only a half-page of text or less, discuss basic information about GE, current events including market volatility and the bailout bill, cautionary statements, GE's intended use for the proceeds of the sale, basic tax considerations, and information on the intended agreement with the underwriters. Exh. G, pp. S-iv, S-1 to S-17. Thus, Plaintiffs' assertion that the most plausible inference is that GE could not draft these 18 half-pages of text in 36 hours (Exh. H, p. 3) is simply not supported by the facts.

making that inference with respect to the September 25 statements.  Plaintiffs' citation of GE's

settlement of an SEC complaint as evidence of GE's scienter is no more availing.  Compl. ¶¶

176-79 .  The SEC settlement relates to accounting judgments made in 2002 and 2003 that are

completely unrelated to the September 25, 2008 statements; the SEC Complaint does not even

mention Mr. Immelt or Mr. Sherin.  See, e.g., City of Monroe Employees Ret. Sys. v.

Bridgestone Corp., 399 F.3d 651, 685 (6th Cir. 2005) (relying on defendants' prior settlements

only because they came in "ancillary lawsuits" all related to the same dispute about the safety of

defendant's tires); see also Exh. N.[25]   Accordingly, Plaintiffs have failed to allege circumstantial

evidence of Defendants' conscious misbehavior or recklessness.

### C.    Plaintiffs' Scienter Allegations Fail under Tellabs

To survive a motion to dismiss under Tellabs, Plaintiffs must allege facts

supporting an inference of scienter that is "more than merely plausible or reasonable – it must be

cogent and at least as compelling as any opposing inference of nonfraudulent intent."  551 U.S.

at 314.  Plaintiffs' allegations fail to meet this test.  The inferences of scienter arising from the

Complaint are implausible both on their face and in light of competing, and far more compelling,

inferences of nonfraudulent intent.

For Plaintiffs' allegations to be viable, one would have to believe that GE's CEO

would intentionally lie to the investing public about GE's plans to conduct an equity offering,

having concededly no personal stake in the matter, and knowing that the lie would be exposed in

four business days.  This contention is highly implausible, as "it is hard to see what benefits

accrue from a short respite from an inevitable day of reckoning." See Shields, 25 F.3d at 1130.

Additionally, Plaintiffs' allegations are coherent only if one also believes that the cadre of highly

---

[25] Moreover, even if the SEC charges were relevant, the SEC settlement did not embody any
admission (or denial) of fact by GE.  Thus, it has no precedential value.

respected key actors involved in the offering – GE's independent directors, bankers at Goldman Sachs, inside and outside counsel, and countless GE employees – not only would have stood idly by as GE's top executive lied, but also would have been complicit in the fraud by filing a knowingly false SEC registration statement.[26]  And, if Plaintiffs' newly minted allegations were true, chief among those who acquiesced in GE's fraud would have been Mr. Buffett himself, Wall Street's "good housekeeping seal of approval."  These inferences are implausible by any measure.  "[T]he tenuous plausibility of the alleged scheme substantially weakens the overall strength of plaintiffs' scienter allegations."  In re GeoPharma, Inc. Sec. Litig., 411 F. Supp. 2d 434, 446 (S.D.N.Y. 2006).

Moreover, Plaintiffs' overarching motive theory – that Defendants lied in order to minimize the dilutive effect of the offering – fails to pass muster under Tellabs because it contradicts common sense and the efficient market principles that Plaintiffs otherwise embrace. Plaintiffs allege that GE concealed its plans to do the public offering so it could simultaneously announce both the offering and Berkshire Hathaway's investment, thereby minimizing downward pressure on the stock's price.  See Compl. ¶ 151.  But Plaintiffs do not explain why news of Mr. Buffett's investment would buoy GE's stock price only if it were announced together with the public offering.  In an efficient market, news of Mr. Buffett's investment would be incorporated into GE's stock price immediately, whether announced together with news of the public offering or at some other time.  That news, in either case, would result in what Plaintiffs

---

[26] The prospectus stated that the offering was being made "in light of continuing volatility and developments in the financial markets since September 25."  Exh. G, p. S-2.

describe as the "'Buffett Premium' – an increase in value on the basis that Buffett's investment in a company vouches for the company's quality as an investment." Compl. ¶ 105.[27]

Plaintiffs' overarching motive theory is also highly implausible because Plaintiffs fail to explain how concealing the offering could have advanced Defendants' alleged motive of avoiding dilution. By October 1, the market knew GE was issuing at least $12 billion in new shares and the details of Berkshire Hathaway's purchase of preferred stocks and warrants. Under the efficient market principles that Plaintiffs embrace, the market would have assimilated both these pieces of information by October 1, even if they had been announced at different times. But, as Plaintiffs allege, it was not until October 2, when GE revealed the "damaging fact that the public offering shares would be sold at a substantial discount to current market value," that the stock dropped. Compl. ¶¶ 106, 109. Plaintiffs have not identified any additional information available to the market on September 25 had the public offering been disclosed that day that was not also available on October 1 and that would have lowered the price of the offering on October 2. Plaintiffs have therefore failed to demonstrate what GE could have gained from allegedly concealing the public offering.

Furthermore, although GE's desire to secure Mr. Buffett's investment is an essential component of Plaintiffs' motive theory, the allegations of the new complaint are fatally ambiguous on critical details of the timing of Mr. Buffett's involvement. Plaintiffs never allege

---

[27] Plaintiffs allege that dilution of GE's shares after the announcement of the public offering on September 25 would have been "irreversibl[e]" despite Mr. Buffett's investment because "Berkshire Hathaway would be buying its shares at the depressed 'post-disclosure' price, if it purchased them at all." Compl. ¶ 152. This is nonsensical. The "Buffett Premium," as Plaintiffs describe it, results from increased investor confidence on news that Mr. Buffett is investing in a company, and has nothing to do with the price at which Mr. Buffett obtains his shares. Moreover, Plaintiffs' allegation that the "week-long gap between the announcement of the offering and its pricing," id., could have resulted in a lower price for the offering is entirely speculative and ignores that the efficient market response to the "Buffett Premium," as pleaded by Plaintiffs, does not depend on the timing of Mr. Buffett's investment.

whether GE had begun negotiations with Mr. Buffett or any other "respected investor" on or before September 25. In fact, the Complaint contradicts itself on this central component of Plaintiffs' motive theory. Compare, e.g., Compl. ¶ 148 (speculating about whether a lead investor such as Berkshire Hathaway existed on September 25), with Compl. ¶ 149 (assuming, although not stating, that no such "lead investor" existed on September 25).

Plaintiffs' fear of specificity is readily understandable. First, they have no factual basis for their allegations concerning Mr. Buffet. Second, Plaintiffs do not clearly allege whether Mr. Buffett was negotiating with GE on or before September 25 because either alternative does great violence to Plaintiffs' motive theory. If Mr. Buffett was negotiating with GE before September 25, it would also be true that Mr. Buffett knew of GE's plans to conduct an equity offering, knew that Mr. Immelt lied on the conference call and so allegedly committed securities fraud, but made his investment anyway. The inference that Mr. Buffett would both damage his reputation by acquiescing in GE's alleged fraud and would invest $3 billion in a company engaging in that fraud strongly conflicts with Mr. Buffett's legendary integrity and investment acumen. See Compl. ¶¶ 150-51. Alternatively, if Mr. Buffett began negotiating with GE only after September 25, Plaintiffs would have to acknowledge that Mr. Buffett's $3 billion investment deal was initiated and completed in only a matter of days – making it all the more likely that the equity offering was completed in a similarly short period.

Under Tellabs, the most cogent and compelling inference is that Defendants did not intend to conduct an equity offering or private sale on September 25, but reacted quickly and decisively to protect GE and its shareholders when volatility in the financial markets continued, if not worsened, and political uncertainties increased. As Plaintiffs allege, "[t]he markets were in near chaos as a result of investor speculation concerning the insolvency of many of the world's

major financial institutions." Compl. ¶ 3. See also supra, pp. 8-10. In light of these

extraordinary events and the further uncertainty they created, the more cogent and compelling

inference is that Defendants took further steps to bolster GE's capital base and liquidity position.

This is the very explanation offered by GE when it announced the equity offering. See supra, p.

11.

## II.    THE COMPLAINT FAILS TO ESTABLISH LOSS CAUSATION

The Complaint should also be dismissed because it fails to allege "loss

causation." "[T]o establish loss causation, 'a plaintiff must allege . . . that the subject of the

fraudulent statement or omission was the cause of the actual loss suffered,' i.e., that the

misstatement or omission concealed something from the market that, when disclosed, negatively

affected the value of the security." Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir.

2005). In addition, "plaintiffs must distinguish the alleged fraud from the 'tangle of [other]

factors' that affect a stock's price. In re Merrill Lynch & Co. Research Reports Sec. Litig., 568

F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting Dura, 544 U.S. at 343). Although a plaintiff is

not required to quantify the loss resulting from the alleged fraud at the pleading stage of the

litigation, a plaintiff must "ascribe some rough proportion of the whole loss to [the alleged]

misstatements." Id. In other words, when the plaintiff's claimed loss coincides with similar

marketwide losses, the complaint fails to plead loss causation when "it has not adequately [pled]

facts which, if proven, would show that its loss was caused by the alleged misstatements as

opposed to intervening events." Lentell, 396 F.3d at 174. The Complaint does not meet these

standards.

First, Plaintiffs cannot establish a causal link between the alleged material

misrepresentation – Defendants' nondisclosure of a planned equity offering on September 25 –

and a loss suffered by Plaintiffs when the equity offering was actually disclosed on October 1.

When GE's plans to conduct the equity offering and private sale were announced on October 1, GE's stock price rose. In other words, GE's stock did not decline when the allegedly concealed information was revealed. See Lentell, 396 F.3d at 173 (A plaintiff must show that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security."). Plaintiffs instead allege that GE's stock price declined on October 2 after news of the offering's pricing was announced. Compl. ¶ 109; id. ¶ 106. But Plaintiffs do not and cannot allege that GE's executives withheld information about the pricing of the equity offering on September 25, because they concede, as they must, that pricing is always set immediately before the shares are sold. Compl. ¶ 147. At bottom, Plaintiffs' claims necessarily fail because they allege that only the news of the offering was fraudulently withheld and that only the price of the offering caused their clamed loss.

Plaintiffs attempt to cure this deficiency by alleging now that it was foreseeable that GE would issue its shares at a substantial discount to current market price. Compl. ¶ 111. But to the extent that it was foreseeable to GE that it would price the offering at a discount, it would have been equally foreseeable to the market as well, and it would have been foreseeable on October 1. As Plaintiffs admit, the allegedly foreseeable discount was driven by "the difficult current market conditions" apparent to everyone, and not any information privately held by GE. Compl. ¶ 111. Plaintiffs thus cannot avoid the fact that there is no causal connection between information Defendants allegedly concealed – that GE would issue new equity – and Plaintiffs' alleged loss.

Second, Plaintiffs make no effort to distinguish the alleged fraud from other factors affecting GE's stock price at the time. Plaintiffs fail to acknowledge that other similarly situated companies that conducted offerings during this same period discounted their stock

comparably to GE.  Additionally, Plaintiffs make no effort to account for the severe market deterioration at the time.[28]  Finally, Plaintiffs do not account for the fact that the public offering price was set at the same level as the exercise price of Berkshire's warrants.  Accordingly, because "Plaintiffs have not alleged facts to show that [Defendants'] misstatements . . . were the proximate cause of [P]laintiffs' loss," they have failed to plead loss causation.  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

## III.   THE COMPLAINT FAILS TO MEET THE STRICT PLEADING REQUIREMENTS OF RULE 9(B) AND THE PSLRA

### A.   The Complaint Fails To Allege with Particularity the Facts on Which Plaintiffs' Belief Is Formed

The PSLRA imposes additional pleading requirements where, as here, a plaintiff makes allegations, on information and belief, that defendants made material misstatements or omissions.  See Compl. at pp. 1-2.  Under these circumstances, the PSLRA requires plaintiffs to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).[29] "[A] complaint can meet the new pleading requirement imposed by paragraph (b)(1) by providing documentary evidence and/or a sufficient general description of the personal sources of the plaintiffs' beliefs."  Novak, 216 F.3d at 314.

The Complaint in no way satisfies this requirement.  See supra, pp. 2, 20, 22.

---

[28] Between September 1, 2008 and October 15, 2008, the Dow fell more than 25%.  Bloomberg Prof'l Servs. & Data Prods. (Bloomberg Finance L.P.).

[29] As the Third Circuit recently explained, "when allegations are made on information and belief, the complaint must not only state the allegations with factual particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey."  Institutional Investors Group v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009).

**B.    Plaintiffs Fail to Specify Why Defendants' Statements About GE's Financial Condition Were False and Misleading**

Plaintiffs allege that Defendants' statements about GE's financial condition were false or misleading, but the Complaint never "specif[ies] each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1)(B).  Plaintiffs place significant weight on Defendants' statements that:  (i) GE was "performing well, despite the 'tough environment' and remained 'financially strong'" (Compl. ¶ 66); (ii) "GE's ability to issue commercial paper ('CP') was not in jeopardy and that GE had more than enough liquidity to weather the storm without the need for any additional external financing" (Compl. ¶ 70); (iii) GE did not need to raise any additional long-term debt in 2008 (Compl. ¶¶ 72, 80) or tap its bank lending facilities (Compl. ¶ 82).[30]  But Plaintiffs fail to "explain[] how the statements were false" and "instead rely on vague and conclusory statements that are not supported by any specific factual allegations." Tabor v. Bodisen Biotech, Inc., 579 F. Supp. 2d 438, 452-43 (S.D.N.Y. 2008) (dismissing complaint); see also Salinger v. Projectavision, Inc., 934 F. Supp. 1402, 1413 (S.D.N.Y. 1996) (dismissing claims when plaintiffs "listed and quoted extensively from many 'statements' in the form of press releases and press reports . . . [without] specif[ying] with particularity how each of these statements were fraudulent").[31]

---

[30] See also Compl. ¶¶ 65, 68, 69, 73, 74, 75, 77, 83, 87, 88.

[31] The Complaint quotes at great length from the September 25 press release and from the transcript of the September 25 conference call, without identifying the specific statements that Plaintiffs claim are false.  See, e.g., Compl. ¶¶ 62, 70, 74, 77, 82.  This type of pleading "plac[es] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts [and] . . . is deficient under the pleading standards."  In re Alcatel Sec. Litig., 382 F. Supp. 2d 513, 534 (S.D.N.Y. 2005) (dismissing 10b-5 claims when plaintiffs "neglect[ed] to make it clear what portion of each quotation constitute[d] a false representation").

### C.    Many of Defendants' Alleged Misstatements Are Merely Non-Actionable Statements of Corporate Optimism

Additionally, Plaintiffs allege that Defendants falsely made "rosy representations" about GE's financial health and appeared "supremely confident" with regard to GE's liquidity position and capital base on September 25, 2008.  See, e.g., Compl. ¶ 114, 118.  Plaintiffs have failed to plead with particularity why any of these alleged misstatements about GE's financial condition are misleading, and, in all events, these alleged misstatements are immaterial as a matter of law.  See ECA, 553 F.3d at 205-06 (holding that alleged misrepresentations about the company's "highly disciplined" risk management and promises to "continue to reposition and strengthen [its] franchises" were "no more than 'puffery'" and thus "too general to cause a reasonable investor to rely upon them").

Accordingly, several of the alleged misstatements are inactionable as a matter of law, including:  GE had a "strong liquidity position" (Compl. ¶ 62); "Immelt reassured investors that GE was performing well, despite the 'tough environment' and remained 'financially strong'"(Compl. ¶ 66); "Immelt and Sherin presented themselves as supremely confident in GE's financial condition" (Compl. ¶ 68); Mr. Immelt stated that the "steps we're taking and that we'll outline today, I think strengthen GE for the long term"(Compl. ¶ 69); "[I]n an environment like that, we've performed pretty well" (Compl. ¶ 70); "So this is a proactive approach we've taken. It makes GE even safer" (Compl. ¶ 73); "[T]he last three weeks have been really challenging in capital markets.  We love the opportunities that we put our capital to work at, at higher margins" (Compl. ¶ 74); and "We're running the company for the long term, and we feel like we've really positioned the company to be successful in this cycle" (Compl. ¶ 77).

### D.      <u>Defendants Are Not Liable for Pre-Class Period Statements</u>

A defendant "is liable only for those statements made during the class period." <u>See</u>, <u>e.g.</u>, <u>In re IBM Corp. Sec. Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998) (defendants had no liability for challenged statements made one day before the class period began).  Here, the alleged class period runs from September 25, 2008 through October 1, 2008.  Yet Plaintiffs include many paragraphs discussing unrelated events that occurred months before the alleged class period begins.  Compl. ¶¶ 176-79, 181-201.

## IV.      THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(A)

Plaintiffs further allege that Mr. Immelt and Mr. Sherin were control persons of GE and thus secondarily liable under Section 20(a) of the Exchange Act for GE's alleged primary violations of Section 10(b) and Rule 10b-5.  <u>See</u> Compl. ¶¶ 229-34.  To state a claim under Section 20(a), a plaintiff must allege:  "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  <u>PXRE</u>, 600 F. Supp. 2d at 548 (citing <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998)).

Because Plaintiffs have failed to plead any of the elements of a Section 20(a) claim, that claim should also be dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Second Amended Class Action Complaint with prejudice.

Dated:  New York, New York
        January 15, 2010

                                WEIL, GOTSHAL & MANGES LLP

                                By: _____/s/  Greg A. Danilow_____

                                    Greg A. Danilow
                                    Paul Dutka
                                    767 Fifth Avenue
                                    New York, New York  10153
                                    T:  (212) 310-8000
                                    F:  (212) 310-8007

                                    *Counsel for Defendants General Electric Company,
                                    Jeffrey R. Immelt, and Keith S. Sherin*

Of Counsel:

        Gregory Silbert
        Adam Banks