UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

DALE WATERS, WESTERN HEART
INSTITUTE, P.C., RETIREMENT PLAN,
INDIVIDUALLY AND ON BEHALF OF ALL          CASE No.: 08-CIV-8484 (RJS)
OTHERS SIMILARLY SITUATED,

                                                                        ECF

            Plaintiffs,


      vs.


GENERAL ELECTRIC COMPANY, JEFFREY R.
IMMELT, and KEITH S. SHERIN,


            Defendants.


----------------------------------------------------------------X

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
### MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT


**THE ROSEN LAW FIRM, P.A.**

Laurence M. Rosen, Esq.  (LR 5733)
Email: lrosen@rosenlegal.com
Timothy W. Brown, Esq. (TB 1008)
Email: tbrown@rosenlegal.com
Phillip Kim, Esq. (PK 9384)
Email: pkim@rosenlegal.com
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827

Lead Counsel for Plaintiffs and the Class

## TABLE OF CONTENTS

Page

I.   **STATEMENT OF FACTS** …………………………………….…………….…………1

II.  **ARGUMENT**…………………….…………………………………………….7

    1. **Applicable Standards**………………………………………….………………7

    2. **The SAC Sufficiently Alleges Facts That Give Rise to a Strong Inference of Scienter** …………………………………………………………...………8

        a. **The SAC Alleges Defendants' Specific Motive by Inferring the Concrete Benefits GE Realized Through Denying GE Would Have a Public Offering**……………………………………………………..8

            i. **Motive to Inflate Stock Price So Offering Is at High Price Is Specific**…………………………………………………….…..8

            ii. **Defendants Succeeded at Doing the Offering at a Higher Price and Were Not Engaged in a Futile Scheme**…………...……………...16

        b. **The SAC Alleges Defendants' Conscious Misbehavior or Recklessness**…….20

    3. **The SAC Pleads Loss Causation**…………………………………….....32

    4. **Failure to Specify Misleading Statements**…………………………………34

    5. **Pre-Class Period Statements**…………………………………….………35

    6. **The SAC Pleads Control Person Liability**……………….……………….…..35

III. **CONCLUSION**…………………………………….…..……………….…..35

## TABLE OF AUTHORITIES

Page(s)

## CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007).................................................................................10 n.6

*Basic Inc. v. Levinson,*
  485 U.S. 224 (1988).......................................................................................18

*Carlson v. Xerox Corp.*,
  392 F. Supp. 2d 267 (D. Conn. 2005)...........................................................24

*Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*,
  480 F.2d 341 (2d Cir. 1973)............................................................................28

*Darquea v. Jarden Corp.*,
  2007 WL 1610146 (S.D.N.Y. May 31, 2007) ................................................10

*Duncan v. Pencer*,
  1996 WL 19043 (S.D.N.Y. 1996)...................................................................10

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)................................................................9, 14 n.12, 20

*Escott v. BarChris Constr. Corp.*,
  283 F.Supp. 643 (S.D.N.Y. 1968)...............................................................28, 29

*Feit v. Leasco Data Processing Equip. Corp.*,
  332 F.Supp. 544 (E.D.N.Y. 1971) ..............................................................28, 29

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999)..........................................................................31

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) .........................................................................31

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008)....................................13, 13 n.9, 13 n.10

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2001)...........................................................21

*In re Axis Capital Holdings Ltd. Sec. Litig.*,
  456 F.Supp.2d 576 (S.D.N.Y. 2006)..............................................................13

*In re Duane Reade Inc. Sec. Litig.*,
  2003 WL 22801416 (S.D.N.Y. 2003)........................................................6 n.4

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009)..........................................................................32

*In re GeoPharma, Inc. Sec. Litig.*,
  399 F.Supp.2d 432 (S.D.N.Y. 2005)........................................................12 n.7

*In re Nortel Networks Corp. Sec. Litig.*,
  238 F.Supp.2d 613 (S.D.N.Y. 2003)................................................................7

*In re NovaGold Resources Inc. Sec. Litig.*,
  629 F.Supp.2d 272 (S.D.N.Y. 2009)........................................................14 n.11

*In re Resource America Sec. Litig.*,
  2000 WL 1053861 (E.D. Pa. July 26, 2000)................................................10

*In re Time Warner, Inc. Sec. Litig.*,
  794 F.Supp. 1252 (S.D.N.Y. 1992)........................................................16 n.13

*In re Time Warner, Inc. Sec. Litig.*,
  9 F.3d 259 (2d Cir. 1993) ..................................................................... passim

*In re Twinlab Corp. Sec. Litig.*,
  103 F. Supp. 2d 193 (E.D.N.Y. 2000) .........................................................10

*In re Vivdendi Universal, S.A. Sec. Litig.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003)........................................................12 n.7

*In re Winstar Communications*,
  2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).............................................31 n.22

*In re Worldcom, Inc. Sec.Litig.*,
  346 F.Supp.2d 628 (S.D.N.Y. 2004)......................................................27, 28, 29

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)....................................................................9, 21

*Lentell v. Merrill Lynch & Co., Inc.*,
  396 F.3d 161 (2d Cir. 2005)....................................................................32, 34

*Malin v. XL Capital, Ltd.*,
  2009 WL 481897 (2d Cir. Feb. 26, 2009)..................................................10 n.6

*Novak v. Kasaks,*
    216 F.3d 300 (2d Cir. 2000)........................................................................7, 9, 21

*Robbins v. Morre Med. Corp.,*
    788 F. Supp. 179 (S.D.N.Y. 1992)...........................................................20 n.16

*Rombach v. Chang,*
    355 F.3d 164 (2d Cir. 2004)....................................................................12, 13 n.8

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)......................................................................... passim

*San Leandro Emergency Medical Group v. Phillip Morris,*
    75 F.3d 801 (2d Cir. 1996)...............................................................................13

*Sirota v. Solitron Devices, Inc.,*
    673 F.2d 566 (2d Cir.1982)..............................................................................11

*Smith v. U.S.,*
    508 U.S. 223 (1993).........................................................................................27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008)........................................................................10 n.6

*Tellabs v. Makor Issues & Rights, Ltd.,*
    127 S. Ct. 2499 (2007)................................................................................ passim

*U.S. v. Simon,*
    425 F.2d 796 (2d Cir. 1969)......................................................................20 n.16

*Yung v. Lee,*
    432 F.3d 142 (2d Cir. 2005).............................................................................7

## STATUTES AND RULES

15 U.S.C. § 78u-4(b)(1) .........................................................................................7
15 U.S.C. § 78u-4(b)(2) .........................................................................................7

I.    **STATEMENT OF FACTS**

The General Electric Company ("GE"), along with many other financial institutions, was under intense market pressures in the first two weeks of September 2008. Second Amended Complaint ("SAC") ¶¶24-60.[1] Earlier in the year, JPMorgan took over Bear Stearns with U.S. Government assistance, and more recently FannieMae and FreddieMac were taken over by the U.S. government and Countrywide Financial was acquired by Bank of America. On September 12, GM and Chrysler announced they were seeking $25 billion in emergency government loans to avert bankruptcy. ¶31. Merrill Lynch narrowly averted bankruptcy after seeing its stock price drop by half before being taken over by Bank of America in a U.S. Treasury-brokered rescue on September 14. ¶33. From September 14-25, the financial crisis worsened. On September 15, Lehman Brothers filed for bankruptcy. ¶35. Wachovia shares dropped like a stone, as rumors of its insolvency and take-over swirled in the market. ¶¶37, 46. On September 18, the U.S injected $80 billion into AIG to avert a global financial collapse.¶39. On September 21, Morgan Stanley and Goldman Sachs became bank holding companies because they needed financial help from the government. ¶42. On September 19, Washington Mutual's liquidity troubles deepened and it announced it was up for sale. ¶48. Due to rampant fear infecting financial stocks, on September 19 the SEC banned short selling securities of 799 financial companies, including GE. ¶49. The world's bedrock financial institutions faced the greatest threat since the great crash of 1929.

The primary source of the worldwide crisis was the large number of non-performing loans and mortgage backed securities held by these institutions that were illiquid, could not be reliably valued, and were presumed to be worth far less than their carrying value. In short, the market believed that many financial institutions were or might be insolvent. As a result, credit

---

[1]  Citations to the Second Amended Complaint will be referred to herein as "¶" followed by  the numeral corresponding to the specific paragraph(s) cited therein.

was tighter, rates were higher and in many instances, banks simply would not lend for any reason. This crisis of confidence had spurred a severe liquidity crisis. With $650 billion in risky financial assets, GE Capital's liquidity was a serious concern for GE's investors.

GE's Triple A rating was always a source of pride for Immelt. He constantly boasted of GE's Triple A rating–stating "we run this company to be Triple A." The implication being that, as a Triple A rated company, GE was a much safer investment than any of its peers. When AIG's and Lehman's troubles sent the world's financial markets into crisis, the credit default swap rate spreads for GE's debt began to widen relative to other Triple A rated companies. ¶41, Ex. 3. Credit default swap rates measure the cost paid to insure against the risk of default of a company's debt. GE's widening credit default swap rate spreads signaled the market believed that relative to other Triple A rated companies, GE was more likely to default on its debt.

To counteract rampant market rumors questioning GE's solvency and liquidity, GE issued a press release on September 14 assuring investors that it was sound financially, had sufficient liquid assets, is "not raising any external capital [i.e. debt or equity] and ha[s] no need to," and had no problem issuing commercial paper, a crucial source of financing for GE. ¶34.

As the crisis worsened, on September 25 GE issued a press release and held a conference call to reassure investors that GE was financially strong despite the liquidity crisis toppling other financial giants. ¶¶58-69. On the call, Defendants emphasized that GE had no liquidity problem, but as a prudent measure, to protect its Triple A rating, GE planned to de-leverage its balance sheet by the end of the 2008 through a series of measures including, reducing dividends from GE Capital to the parent by 75%, ceasing GE's ongoing stock buy-back program (having purchased $3.5 billion of GE common stock in 2008), reducing borrowings of long-term debt and commercial paper, and reducing the size of its loan portfolio.[2] Defendants reassured investors

---

[2]  De-leveraging is accomplished by increasing (selling) equity, decreasing debt or both.

2

that GE had no problems issuing commercial paper at advantageous interest rates, denying rumors to the contrary. ¶70. Sherin, GE's Vice-Chairman and CFO, stated GE had many reliable internal funding sources, liquidity was not a concern and, rather than raise an additional $10 billion of debt this year, GE "was done for the year". ¶70. Thus, Defendants painted GE's picture as so financially strong that it didn't need the $10 billion cash it originally planned to borrow.

Referring to GE's September 14 announcement that GE would not raise any debt or equity–and had no need to--a Citigroup analyst asked Immelt point-blank to confirm that GE was not going to issue new equity given the current liquidity crisis plaguing financial institutions:

> **<Q - Jeffrey Sprague>**:  And just finally, Jeff, is the idea of any new equity still off the table? You know, someone like a Mubadala all the sudden does some new equity as opposed to buying the stock in the new market. Is that type of thing open for discussion in any type of permutation? Maybe not just them, but others?
> **<A - Jeffrey Immelt>**:  <u>You know, Jeff, we just don't see it right now. Again, we feel very secure about how the funding looks and the strength of the company and the strength of the balance sheet. Cash flows are great. The liquidity profile has been strong; it's now stronger. Leverage is better. And so we really believe in our business model and feel kind of secure that we're well-positioned here.</u>

¶79. The import of Immelt's response is that GE carefully considered whether to raise additional equity of any type or form, and GE concluded that despite the current crisis, it had no need for it–and did not foresee conditions worsening to the point that new equity would be needed.

Six days later GE raised $17 billion dollars in one of the largest equity offerings ever.[3]

¶112-13. The disparity between Defendants' statements on September 25 and their actions on October 1 permits only one inference: deception. Defendants claimed their decision to issue equity was based on new market conditions–specifically (i) the failure of WaMu, (ii) the sale of Wachovia Corp. and (iii) Congress' stalling passage of an economic-rescue package. ¶¶128, 130.

---

[3]  In the public offering GE sold over $14 billion of common stock, including the overallotment option. GE sold privately $3 billion of preferred stock to Berkshire Hathaway, with warrants to purchase another $3 billion of common stock. ¶112-13.

Tellingly, on the October 10 conference call, Immelt and Sherin stated the purpose of the equity offering was to protect GE's ability to sell commercial paper and eliminate liquidity issues. ¶123.

Defendants varied explanations for the contradiction between their statements and their actions six days later is not credible. On September 25 Defendants stated GE had no problems issuing commercial paper--that there were no liquidity or funding issues surrounding its commercial paper. ¶70. Yet, Defendants' apparent explanation for "accelerating" the liquidity plan by doing the $17 billion offering was to eliminate liquidity issues surrounding GE's ability to issue commercial paper. Defendants do not and cannot explain away this blatant contradiction. Indeed, former Goldman chairman and former Treasury Secretary Henry Paulson states in his new book, *On the Brink: Inside the Race to Stop the Collapse of the Global Financial System*, that his longtime business associate whom he's known and admired for years, Immelt, "stunned" Paulson on September 8 and 15, by telling him that for GE it is "very difficult" to sell commercial paper "for any term longer than overnight." Declaration of Timothy W. Brown ("Brown Decl.") at 3, Ex. 1. Yet September 14, GE told investors its ability to sell commercial paper was "robust." ¶34.[4] GE repeated this misrepresentation on September 25. ¶¶62, 70, 82.

Defendants assert that continued market volatility caused a sea-change in their plans. Yet WaMu's impending failure or sale had been well known for weeks. ¶¶30, 38, 48, 54, 57. Wachovia's likely sale to a stronger bank was also already a fait accompli. ¶¶37, 46, 53, 59. Moreover, financial markets were relieved when WaMu's assets were successfully sold to JPMorgan Chase, and Wachovia was placed in safe hands. ¶¶94, 135. Nor was Congress' lack of progress in passing the bail-out on September 28 sufficient reason for GE to change plans as Congress agreed to the bail-out September 30, two days later. ¶98. On the September 25 call,

---

[4] The Court can consider Paulson's statements as they are integral to the Complaint. *Faulkner v. Beer*, 462 F.3d 130, 134 (2d Cir. 2006).

Defendants didn't indicate GE's liquidity plan depended on Congressional action. Similarly the 8.4% drop in GE stock on September 29, was more than made up for by a 10.4% increase the next day, September 30. ¶¶96-98. Moreover, the 8.4% drop in GE stock price was not atypical at that time; e.g., GE shares dropped 8% on September 15 and 8.6% below its opening price on September 19. ¶¶36, 49-50.

It is implausible that GE first made the decision to issue $15 billion in equity on Monday, September 29 after learning that Congress stalled on bail-out legislation because this would have required that within 48 hours of that decision (i) GE negotiate terms with underwriters, (ii) GE obtain board approval, and (iii) the underwriters complete due diligence for a $12 billion public offering, when GE's mortgage loan asset values were subject to grave doubt.

GE's September 14 and 25 announcements were intended to reassure the market that GE had sufficient liquidity and did not need additional external financing. On the September 25 call Defendants carefully avoided talking about GE issuing new equity. Only when Immelt was caught off guard by Citibank analyst Jeff Sprague's direct question did he address the topic. A week earlier, Goldman Sachs hastily sold $10 billion of stock to Berkshire Hathaway (Warren Buffett) and the public. ¶59. The market was intensely scrutinizing the liquidity of financial institutions. The market perceived GE as struggling to roll over its commercial paper. ¶¶41, 100, 145. Announcing GE needed $15 billion of equity would have created a crisis of confidence, putting downward pressure on GE's stock price. GE, however, wanted its stock price as strong as possible for the very large equity offering it was planning. Immelt was in a quandary. Speaking the truth and admitting a weak financial position would cause an immediate sell-off of GE securities and increase commercial paper borrowing rates, thereby jeopardizing GE's ability to successfully complete the offerings, and threatening GE's solvency. Immelt chose the safest

5

course for GE, though at the price of his integrity. After the September 25 call, analysts updated their earnings estimates for GE–and assumed that shares outstanding would not change in the near future. ¶86. GE's stock price rose on the positive news that GE had sufficient liquidity and had no need for equity financing-even though, on the call, GE revised downward its earnings estimates for third quarter and full year. ¶90. Defendants' statements that GE needed no external financing were effective in assuaging investor concern and stabilizing its stock price in advance of GE's October 1 equity offering.

It is also curious that GE pre-announced third-quarter earnings and issued revised guidance on September 25 before the quarter had ended, when its regularly scheduled end-of-quarter conference call was already set for October 10, just two weeks away. GE had no need to revise its earnings estimates at this time–unless it was about to sell equity.[5] GE revised its earnings guidance on September 25 because GE was compelled to disclose the lowered earnings guidance prior to underwriters' due diligence and marketing for the offerings. Purchasers in the October 1 offerings, including Berkshire, would have cried foul had GE waited until October 10 to announce its failure to meet third quarter and full-year earnings estimates, especially given GE confirmed its prior guidance September 14.[6] Had GE disclosed the lowered earnings guidance in the prospectus, the negative surprise would have had a devastating effect on the offering.

Defendants' requested inference--changed economic circumstances warranted a change in financing strategy--is incredible. Defendants always believed market turmoil would continue unabated, as Immelt himself said September 25. ¶133. By concealing the offering until it was

---

[5]  "[T]here is no obligation to release interim sales data prior to a quarter's end." *In re Duane Reade Inc. Sec. Litig.*, 2003 WL 22801416, at *5 (S.D.N.Y. 2003).

[6]  Even if GE could have privately disclosed its lower earnings guidance to Berkshire before the offering, Berkshire would have wanted to price its purchase after the revised earnings were publicly announced, as risk of GE's stock price declining upon public disclosure was high.

6

ready to be priced and marketed, which Defendants admit is the goal of rapid shelf offerings, GE saved over $1.5 billion. ¶146; MTD at 9-10. The only credible inference is Defendants concealed the offering until the last moment to avert investor panic, protect GE's ability to sell commercial paper, which they misrepresented as robust, and complete the offering, saving over $1.5 billion.

## II.    <u>ARGUMENT</u>

### 1. <u>Applicable Standards</u>

The Court will make all reasonable inferences in Plaintiffs' favor and accept as true factual allegations in the SAC. *Yung v. Lee*, 432 F.3d 142, 146 (2d Cir. 2005). "A pleading is not a trial and plaintiffs are not required to marshal their evidence and sustain a verdict at this stage." *In re Nortel Networks Corp. Sec. Litig.*, 238 F.Supp.2d 613, 621 (S.D.N.Y. 2003).

The Private Securities Litigation Reform Act ("PSLRA") requires the complaint to "specify" each false statement, explain "the reasons or reasons why the statement [was] misleading," and "state with particularity facts giving rise to a strong inference" of scienter. *Novak v. Kasaks*, 216 F.3d 300, 306-07 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) and (b)(2)) (quotations omitted; emphasis omitted). Scienter can be pleaded "**<u>either</u>** (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, **<u>or</u>** (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 307 (citations omitted; emphasis added); *see Tellabs v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2507 (2007). While motive is not required, its presence "can be a relevant consideration" indicating conscious misbehavior or recklessness. *Id.* at 2511.

The Supreme Court articulated the measure to determine whether the complaint pleads facts that give rise to a strong inference of scienter: "A complaint will survive . . . if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510. If the inferences for and against

7

scienter are equally strong, the Court must deny the motion. The Supreme Court cautioned: "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 2510.

The Court must read allegations of conscious or reckless misconduct together with motive allegations to determine whether the SAC gives rise to a compelling inference of scienter. *Id.* at 2511. When all allegations in the SAC are read holistically and accepted as true, the only plausible inference is that Defendants either knowingly or recklessly misled the investing public by affirmatively denying GE's plans to make the second largest stock offering in U.S. history.

2.  **The SAC Sufficiently Alleges Facts That Give Rise to a Strong Inference of Scienter**

   a.  **The SAC Alleges Defendants' Specific Motive by Inferring the Concrete Benefits GE Realized Through Denying GE Would Have a Public Offering**

      i.  **Motive to Inflate Stock Price So Offering Is at High Price Is Specific**

Motive is adequately alleged by "stating concrete benefits that could be realized by one or more of the false statements." *Rothman v. Gregor*, 220 F.3d 81, 93 (2d Cir. 2000). In *In re Time Warner, Inc. Sec. Litig.*, the Second Circuit held that allegations of misstatements intended to inflate a company's stock price so as to raise equity financing were sufficient to allege specific motive of corporate officers. 9 F.3d 259, 269-70 (2d Cir. 1993) (officers were motivated to conceal "consideration of [a] rights offering to maintain a high stock price prior to announcement of the new rights offering in order to lessen the dilutive effect"). *Time Warner* is the only Second Circuit opinion that is exactly on point, and is binding law on this Court. In recognizing that, under *Time Warner*, their motion must be denied, Defendants feebly argue that *Rothman* modifies *Time Warner*, that district courts overrule *Time Warner*, and that the Supreme Court negated *Time Warner* in *Tellabs* by heightening the pleading standards for scienter. 127 S. Ct. 2499. However, *Rothman* does not modify, but rather affirms *Time Warner*. *Tellabs* affirms the

Second Circuit's previous pleading requirements for scienter—but if *Tellabs'* standard is different in any way, it requires less to show scienter than what had been required by the Second Circuit.

First, according to the Supreme Court and the Second Circuit, pre-*Tellabs* Second Circuit decisions are just as binding as post-*Tellabs* Second Circuit decisions. *Tellabs*, 127 S. Ct. at 2509 (Congress "adopt[ed] Second Circuit's 'strong inference' standard" in creating the PSLRA); *Novak*, 216 F.3d at 310 (the PSLRA "did not change the basic pleading standard for scienter in this circuit"); *Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) ("The PSLRA's language echoed this Court's scienter standard").

Second, *Tellabs* holds that when a court examines "whether the pleaded facts give rise to a 'strong' inference of scienter," under the PSLRA, "the court must take into account plausible opposing inferences." 127 S.Ct. at 2509. For an inference of scienter to be "strong," the inference "must be more than merely 'reasonable' or 'permissible'--it must be cogent and compelling, thus strong in light of other explanations." *Id.* at 2510. No Second Circuit case states or even indicates that the Second Circuit's standard to determine a strong inference of scienter has changed after *Tellabs*, or that its previous decisions applying the scienter standard are no longer binding. Indeed, many post-*Tellabs* Second Circuit opinions rely on both *Tellabs* and various pre-*Tellabs* Second Circuit decisions, without indicating any inconsistencies in the *Tellabs* and the pre-*Tellabs* Second Circuit scienter pleading requirements. *See*, *e.g.*, *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198-99, 201 & n.6 (2d Cir. 2009) (relying on *Rothman*–**which relied on *Time Warner***, among many other pre-*Tellabs* cases: "We acknowledge that the artificial inflation of stock prices in order to acquire another

company may, 'in some circumstances,' be sufficient for scienter").[7]

Indeed, many cases in this circuit post-PSLRA and post-*Tellabs* held that motive is inferred by defendants inflating stock price to consummate an offering. *See*, *e.g.*, *Darquea v. Jarden Corp.*, 2007 WL 1610146, at *27 (S.D.N.Y. May 31, 2007), *aff'd* after reconsideration based on *Tellabs* ("[p]laintiffs adequately alleged scienter in that defendants could have been motivated to artificially inflate the stock price in order to convert a class of preferred stock to common stock, so as to lift restrictions on the Company's ability to raise funds . . ."); *Duncan v. Pencer*, 1996 WL 19043, at *14 (S.D.N.Y. 1996) (relying on *Time Warner* in holding that a motive to "keep [the corporation]'s stock price high and complete two large public offerings" at prices above the company's actual book value establishes scienter); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000) (that issuer "inflate[d] the stock price to maximize revenue from the secondary offering" is a "sufficient allegation of motive"); *In re Resource America Sec. Litig.*, 2000 WL 1053861, at *6-7 (E.D. Pa. July 26, 2000) (defendants had motive to artificially inflate the stock to do a $112 million public stock offering).

Furthermore, if there is any doubt that the pleading standard for scienter when *Time Warner* was decided was not the same as that established in *Tellabs*, it was more stringent at the time of *Time Warner*. *Tellabs* defines "strong inference" as "cogent and at least as compelling as any opposing inference." 127 S. Ct. at 2510. Under *Tellabs*, a tie between competing inferences of scienter is sufficient to overcome a motion to dismiss. The 'tie' factor gives plaintiffs the benefit of the doubt, which arguably the Second Circuit did not give them pre-*Tellabs*. *Id.* at 2513 (Justice Scalia, concurring, opines that *Tellabs* requires less of plaintiffs than the PSLRA, which echoed the language of the Second Circuit pre-PSLRA). *Tellabs* also reduces the scienter

---

[7] *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194-97 (2d Cir. 2008); *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99-104 (2d Cir. 2007); *Malin v. XL Capital, Ltd.*, 2009 WL 481897 (2d Cir. Feb. 26, 2009).

pleading requirements in that all allegations of scienter must be assessed holistically. *Id.* at 2511.

Defendants also argue the Second Circuit overruled itself in *Rothman* by limiting *Time Warner's* reach to the desire to carry out corporate acquisitions. 220 F.3d 81 (2d Cir. 2000). However, *Rothman* and its progeny support *Time Warner*. *Rothman* confirmed that allegations that defendants made misstatements to inflate a company's stock price in order to consummate an acquisition alleged motive. 220 F.3d at 93-94. The Second Circuit in *Rothman* **without any doubt** does not limit *Time Warner's* "reach to the alleged 'desire to carry out corporate acquisitions,'" despite that this Court mentioned in *dicta* that some "[c]ourts in this District have interpreted *Rothman's* language" to limit *Time Warner*. *PXRE*, 2009 WL 539864, at *18, n.24. The entire portion of the *Rothman* decision that concerns *Time Warner* is as follows:

> This Court has ruled that, in some circumstances, the artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter. *See In re Time Warner Inc. Securities Litigation*, 9 F.3d 259, 270 (2d Cir.1993) (sufficient pleading of motive that company allowed prior statements to become misleading by material nondisclosure of company's active consideration of rights offering in order to maintain high stock price before announcing new rights offering in order to lessen dilutive effect of that announcement on stock price); *cf. Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 573 & n. 2 (2d Cir.1982) (sufficient evidence to support jury finding of defendants' fraudulent intent to overstate inventory, including, among other evidence, that company benefitted from overstated inventory because stock price followed rising reported earnings, "enabling [the company] to make numerous acquisitions after a five-for-one split") (footnote omitted).

220 F.3d at 93. *Rothman* **does not even opine** on circumstances in which artificial inflation of stock price may be **in**sufficient for scienter. *Id.* Rather, *Rothman* positively states that "in some circumstances" artificial inflation of stock price in the acquisition context "may be sufficient." *Id.* Thus, as the circumstances in *Rothman* are "in the acquisition context," *Rothman* merely opines in the above excerpt that *Time Warner* **supports** the finding that "artificial inflation of stock price in the acquisition context may be sufficient for securities fraud scienter." *Id. Rothman* merely **compares** *Time Warner* to *Sirota*, which found specific motive in the *acquisition* context

11

(using the abbreviation for the word "compare": "cf."). *Rothman* clearly does not state that *Time Warner* limits finding of specific motive to the acquisition context. Rather, *Rothman* **explicitly recognizes** that *Time Warner* holds that the motive to "maintain high stock price before announcing a new rights **offering** in order to lessen dilutive effect of that announcement on stock price" is probative of scienter. *Id.* (emphasis added). Furthermore, in *Time Warner* **defendants were not alleged to have considered or made a corporate acquisition!** *Time Warner*, 9 F.3d at 262, 266-67. Defendants only considered making strategic alliances. *Id.* Since there was no allegation of a planned acquisition in *Time Warner* at all, how could the Second Circuit's determination of motive in *Time Warner* be limited to acquisitions? Thus, there is **no basis** to interpret *Rothman* as limiting *Time Warner*'s reach to the corporate acquisition context.[8]

Defendants also mistakenly cite *Rombach v. Chang*. 355 F.3d 164 (2d Cir. 2004). *Rombach* is inapposite as defendants were alleged to have concealed and misrepresented facts over a 15-month period during which the company completed an offering and several

---

[8] It should be noted that *In re Vivdendi Universal, S.A. Sec. Litig.* does not try to limit *TimeWarner's* holding in any respect. 381 F. Supp. 2d 158, 185 (S.D.N.Y. 2003). Indeed, *In re Vivendi* refers to *Rothman*--without mentioning *Time Warner*--as an example of how "[s]cienter may be imputed, as is the case here, to defendants when defendants' were motivated to inflate company stock prices as a means to effectuate a specific acquisition that would not otherwise be possible without fraudulently inflating stock prices." *Id.* It should also be noted that *In re GeoPharma, Inc. Sec. Litig.* had nothing to do with defendants inflating stock price to avoid dilutive effects of an offering. 399 F.Supp.2d 432, 449-50 (S.D.N.Y. 2005) ("Plaintiffs allege that GeoPharma's motive to inflate its share price was to force some of its noteholders and preferred shareholders to accept shares of its common stock, so GeoPharma could avoid making principal, interest and dividend payments pursuant to those financing arrangements"). Also, *GeoPharma* recognized that the *Time Warner* rule that inflating stock price to avoid dilution proves motive does not also require an acquisition. *Id.* at 450, n.138 (describing the *Time Warner* claim as based on the "allegation that defendants wanted to lessen dilutive effect of upcoming offering, and avoid jeopardizing talks with potential strategic alliance partners").

acquisitions. *Id.*[9] Motive just to inflate stock price–without intending to affect a specific corporate transaction is too general. "[A]rtificial inflation of a stock price in order to achieve some more specific goal may satisfy the pleading requirement" *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F.Supp.2d 576, 594 (S.D.N.Y. 2006).

Nor does the Second Circuit decision in *San Leandro Emergency Medical Group v. Phillip Morris* support Defendants' contention that GE had no motive to misrepresent its plan to raise at least $15 billion. 75 F.3d 801 (2d Cir. 1996). First, in *Phillip Morris* the Second Circuit found defendants made no false statements. Second, there plaintiffs alleged defendants made false statements over a three-month class period, while the **debt** issue to which plaintiffs pointed to for motive was done in the first week of the class period. There was thus no motive to continue the fraud for three months thereafter.

Defendants cite only one case in their defense that is at all relevant: *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 468-69 (S.D.N.Y. 2008). The *AstraZeneca* court found only a "generalized motive" because the class period extended for almost a year and a half, and the offering occurred in the middle of the class period. It is almost a given that a large publicly held company would offer stock at some point during a year and a half.[10] Thus, the misrepresentations occurring over a long class period were not related to the offering. The longer the class period, the more generalized such motive becomes.[11] Here, GE's misrepresentation was made to

---

[9] In *Rombach v. Chang*, the district court noted that most of the alleged misstatements were made *after* the acquisitions upon which the motive allegations were based. 2002 WL 1396986, at *9 (E.D.N.Y. 2002). Moreover, the Second Circuit found the defendants had not made a misleading statement. *Rombach*, 355 F.3d at 175. The district court found the lack of a false statement or omission militated against finding scienter as one can't act with scienter without making false statements. *Rombach*, 2002 WL 1396986, at *9.

[10] Moreover, in *AstraZeneca* 80% of the insider sales occurred at the very beginning of the class period, after the first misstatement, but prior to the bulk of the 15 or so alleged misrepresentations, negating any inference of scienter.

[11] Also, *AstraZeneca* found defendants made no misrepresentations. 559 F.Supp.2d at 470-71.

13

increase GE's stock price for a discrete period of five trading days for the specific purpose of enabling the offering to be consummated. ¶¶146-48.[12]

The SAC alleges that by misrepresenting that GE did not need to raise equity, GE stabilized its stock price, thereby improving its ability to obtain a lead investor such as Berkshire, cinching GE's ability to attract investors and complete the public offering on more advantageous, less dilutive, terms. ¶¶146-48. As further evidence of motive, the SAC alleges Defendants concealed the offering to alleviate market concerns that it could not continue to issue commercial paper–thus averting a liquidity crisis--because GE's credit default swap spreads had increased to unprecedented levels relative to other triple-A rated companies. ¶¶142-45. This allegation is not "generalized" because the SAC attaches market data showing that GE's credit default swap spreads were widening to a much greater extent than its peers. ¶143, Ex. 3. Analysts also raised serious concerns about GE's ability to continue funding operations with commercial paper. ¶¶41, 100, 145.[13] Former Goldman chairman and former Treasury Secretary Paulson states Immelt told

---

[12] Defendants also rely on *In re NovaGold Resources Inc. Sec. Litig.* for its comment that motive to keep stock price high to minimize the dilutive effects of an offering is too generalized. 629 F.Supp.2d 272, 304, n.24 (S.D.N.Y. 2009). However, *NovaGold* made this terse remark in a footnote as *dicta*, noting "[p]laintiff introduce[d] [the] new theory in its opposition brief." *Id. NovaGold* distinguished *Time Warner* in that the latter involved "not only a new stock offering that substantially diluted the rights of existing shareholders . . . but also an offering that followed unsuccessful efforts to find strategic partners who would infuse the debt-laden company with cash." *Id.* (internal quotations omitted). The same distinction applies here. Defendants avoided dilution from the public offering by attracting the most strategic investor there is, Warren Buffet.

[13] Defendants mistakenly rely on *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, which actually supports Plaintiffs' argument that Defendants had a concrete motive. 553 F.3d 187 (2d Cir. 2009). *ECA* states that the rule of *Rothman* (not the rule of *Time Warner*) that "the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter" is an "inquiry [that] is . . . extremely contextual . . ." *Id.* at 201, n.6. *ECA* found the "the fact that the alleged misstatements began eight years before the acquisition and ended years afterward renders any connection between the events dubious at best." *Id.* at 201. Applying *ECA*'s decision to the *Time Warner* rule, the Court must weigh the depth of the connection between the misstatement and the offering. Here the connection is extremely strong and direct. Indeed, Defendants first said there would be no offering. Four

him two times before the September 25 call that for GE it is "very difficult" to sell commercial paper "for any term longer than overnight." Brown Decl. at 3, Ex. 1.Yet on September 14 GE told investors its ability to sell commercial paper was "robust." ¶34.

Defendants incorrectly argue that *Time Warner* itself required more than an offering to establish motive, but also acquisition prospects. First, as mentioned above, *Time Warner* defendants never considered acquisitions, but rather strategic alliances, like in the instant matter in which Defendants sought a strategic investor. Second, Defendants here sneakily conflate two issues, which they otherwise recognize throughout their brief as distinct. One issue is whether inflating stock price to avoid dilution constitutes motive, which is debated in Defendants' MTD at 14-20. The other issue is whether it would be irrational for Defendants to hide the public offering if announcing it only a few days later would ultimately dissipate any artificial inflation-- which Defendants argue subsequently. MTD at 25-29. *Time Warner*'s discussion of the latter is what Defendants cite out of context. There, *Time Warner* finds the strategic alliances are relevant only in as much as defendants' disclosure of the strategic alliances could be expected to artificially increase Time Warner stock price. That *Time Warner* analyzed the strategic alliances only to determine whether defendants were engaged in a futile scheme is clear in looking at more of the passage, of which Defendants quote less than a sentence:

> The unresolved issue is whether the effects of the alleged **artificial raising of the stock price** by the combination of the glowing reports of potential strategic alliances and the nondisclosure of the active consideration of a rights offering <u>could reasonably have been **expected** by the company not to have been completely **dissipated**</u> by the announcement of the rights offering, <u>thereby</u> *enabling the company to set the rights offering price somewhat higher than would have been possible without the misleading statements and to lessen the dilutive effect of the offering.*

---

business days later they announced a $12 billion offering. The offering was at a higher price because they were able to attract the most strategic investor. The misrepresentation also protected GE's ability to continue issuing commercial paper when the market for it was drying up because of concerns about GE's liquidity.

9 F.3d at 269 (emphasis added). Plaintiffs do show how such a scheme, just as in *Time Warner*, is not futile, below. But here, *Time Warner* reveals--in the last clause of the excerpt quoted above in italics—that inflation of stock price to lessen the dilutive effect of an offering is the kind of allegation that sufficiently pleads motive. *Id.*[14] The critical fact under *Time Warner* for finding motive is the misrepresentation must be directly connected to the dilutive offering, which is precisely the case here.  GE denied it was conducting the offering in order to protect its ability to issue commercial paper, attract a lead investor and complete the offering at a higher price. ¶¶145-51.

Thus, as *Time Warner* is binding law, the SAC alleges a concrete benefit giving rise to a strong inference of scienter, which is cogent and as compelling as any opposing inference.

### ii. Defendants Succeeded at Doing the Offering at a Higher Price and Were Not Engaged in a Futile Scheme

Defendants contend they had no rational motive to conceal the offering because it would have merely delayed the inevitable stock price decline, with no benefit to GE. MTD at 26. GE's "futile scheme" defense is the same argument the Second Circuit rejected in *TimeWarner*. There, defendants contended it would be irrational to knowingly conceal the stock offering for any period of time because once the offering was announced Time Warner's stock price would inevitably drop. *Time Warner,* 9 F.3d at 269. The Second Circuit found it reasonable to conclude that defendants derived concrete benefits from "playing up strategic alliances while simultaneously keeping secret until the last moment the alleged active consideration of a rights

---

[14] Defendants also argue that *Time Warner* law does not apply to them because *Time Warner* involved issuing 60% of the number of shares outstanding, whereas here 6% of the number of outstanding shares were issued. MTD at 20. First, *Time Warner* does not state anything about motive depending on how much outstanding stock is diluted. Second, the aggregate monetary benefit to GE in this case is much greater than that in *Time Warner*. Here, GE completed a $14 billion public offering. In *Time Warner* the offering was about $3.5 billion. *In re Time Warner Inc. Sec. Litig.*, 794 F.Supp. 1252, 1254 (S.D.N.Y. 1992).

16

offering." *Id*. The Second Circuit explicitly held that defendants could have reasonably believed the full effects of the artificial inflation might not have been dissipated upon announcement of the offering, and that "defendants acted in the belief that they could somewhat reduce the degree of dilution by artificially enhancing the price of the stock." *Id*. Defendants argue the efficient market theory proves their alleged motive is based on a futile scheme. But, *Time Warner* explains why they are wrong:

> Though confidence in the efficient markets hypothesis is not universally shared, . . . we do not intend to permit a scienter allegation to survive dismissal on the vague possibility that some irrational share purchasers might not comprehend disclosures made in the normal course by a company that has fully and timely discharged all its disclosure obligations. But the allegations here are that a company has not discharged its disclosure obligations and has permitted prior statements (concerning strategic alliances) to become misleading by a material nondisclosure (of the active consideration of a dilutive rights offering). In such circumstances, we consider the pleading sufficient to survive dismissal because, however efficiently markets may be thought to work when disclosures are proper, it is not beyond doubt that they may not fully correct for prior misleading information once a necessary disclosure has been made.
>
> . . . . Since the laws of economics have not yet achieved the status of the law of gravity, we cannot say, on a motion to dismiss, that the plaintiffs cannot prove that a motive existed. What cannot be determined from the pleadings is whether, in this instance, the defendants acted to maintain the stock price at an artificially enhanced value in the hope that it would not descend all the way to its "true" value upon announcement of the fact-consideration of the rights offering-that rendered the prior statements misleading.

*Id.* at 270-71. *Time Warner* thus holds that the efficient market theory is just that, a theory--not an immutable law. *Time Warner* requires finding that Defendants may have rationally expected that the ultimate net effect on GE's stock price of delaying announcement of the offering to coincide with announcement of Buffet's investment several days later would be a higher stock price for the offering.

　　*Time Warner* also requires finding Defendants may have rationally expected that the shorter the period of time between the announcement of the shelf offering and the sale of the

offering, the less the price would be subject to volatility. The reasonable inference that Defendants believed concealment until the last minute would result in the stock offering being completed at a higher price is bolstered by Defendants' own contention that the purpose of a rapidly executed shelf offering is to eliminate the market-price risk inherent in a lengthier conventional offering that often includes investor road shows. MTD at 10-11. Defendants admit GE's strategy in this instance was to announce the offering, price it and complete it in 24 hours to eliminate market risk between announcement and completion. *Id.* GE concealed the offering to prevent further widening of the credit default swap spreads and to maintain investor confidence amidst unprecedented market volatility to avoid a melt-down in GE's stock price–as had very recently happened with several other financial institutions. ¶¶24-60. Indeed, Treasury Secretary Paulson states that Immelt told him several times just before the September 25 call that for GE it is "very difficult" to sell commercial paper "for any term longer than overnight." Brown Decl. at 3, Ex. 1.

As Buffet's investment is the good housekeeping seal of approval for Wall Street, Defendants reasonably believed GE's stock price would decline much less if the negative news of the $12 billion offering was released simultaneously with the positive news that Buffet was investing $3 billion. ¶151. Indeed, the "Buffet Premium" denotes that Buffet's investment in a company makes the company more valuable. ¶105.

Defendants' argument that the Buffet Premium would cause the price of GE stock to go up as much as it did on October 1--whether the public offering was announced on October 1 or September 25--ignores that the market's reaction to specific news does not occur in a vacuum. MTD at 27, n.27. Rather, the market weighs the entire "mix of information available" at that time. *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Investors evaluated news of the $12 billion offering on October 1 in the context of other available news, including that Buffet thought

18

GE was a sound investment. When the pricing for the offering was announced on October 2, the market evaluated that new information–driving down the price to the public offering price.[15]

Immelt's assurances that GE had sufficient liquidity to weather the storm would never have been believable if he had simultaneously stated GE's plan to immediately raise an additional $15 billion. Rather than increase on September 25, GE's stock price would have decreased. And it would have decreased more than it did on October 2 to account for dilution in the offering because instead of just one piece of negative news, the market would have had three pieces of negative news: (1) GE had a liquidity problem and needed cash; (2) GE might not be able to raise the necessary funds in time and may suffer the same fate as AIG, Lehman and Bear Stearns, and (3) existing shareholders would suffer significant dilution if and when the offering is completed. These three pieces of negative news created an unacceptable risk that GE's stock price would drop substantially on September 25. Moreover, had Defendants announced the public offering on September 25--indicating GE's dire need for cash, the rates GE was being charged for commercial paper would likely have gone up tremendously, such that GE might have collapsed altogether and/or Buffet may have declined to invest. Instead of selling $17 billion of stock at $22.50/share GE may have found itself selling it at $15/share, costing it billions of

---

[15] Defendants also mention that GE's stock price did not fall until October 2 when pricing for the public offering was announced, and suggest--without explaining why--that it supports Defendants' plea that they could not have gained from concealing the public offering. *See* MTD at 27. This is just the correlative of fraud by hindsight, which should be labeled lack of "motive by hindsight." Defendants could not possibly have known on September 25 how GE's stock price would react on October 1 and 2. Moreover, Defendants no longer make their "double hit" theory made in the Memorandum of Law in Support of the Motion to Dismiss the First Amended Complaint. Docket # 15 at 14-15. The Court should thus find that Defendants concede that news of the offering on October 1 in the context of the other available news, including that Buffet thought GE was a sound investment, had a separate and distinct effect on the market price than that caused by the news of the *pricing for* the offering on October 2.

dollars–or the deal may not have been done at all, sealing GE's fate. ¶156.[16] Having seen Bear Stearns and Lehman Brothers collapse from illiquidity and loss of investor confidence, Defendants were motivated to avoid such disastrous, but realistic, possibilities.[17]

### b.  The SAC Alleges Defendants' Conscious Misbehavior or Recklessness

The necessary strong inference of scienter may be demonstrated through *either* strong circumstantial evidence of conscious misbehavior or recklessness, which are shown by facts indicating the Defendant: (1) "engaged in deliberately illegal behavior"; (2) "knew facts or had access to information suggesting that their public statements were not accurate"; or (3) "failed to check information they had a duty to monitor." *ECA*, 553 F.3d at 198. Reckless conduct is "at the least, conduct which is highly unreasonable which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or

---

[16] Defendants also incorrectly state that the SAC is ambiguous about when GE secured Buffet's investment, and argue that whether negotiations occurred before or after September 25, the inference of motive is weakened. MTD at 27-28. First, throughout the SAC (inlcuding ¶¶ 148-149 cited by Defendants) Plaintiffs do not allege that GE was already negotiating with Buffet by September 25, but that GE was planning to attract a lead investor such as Berkshire. Second, even if Buffet negotiated with GE before September 25, who would assume Buffet knew Defendants would discuss, or for that matter, lie about it on September 25? Once Defendants violated securities laws on September 25, Buffet had no duty to correct the misrepresentation and was in no way implicated in Defendants' misconduct. No court has ever taken seriously such an innocence-by-association defense. If Buffet began negotiations after September 25, it in no way supports Defendants' theory that it is reasonable for the following to have occurred in two business days after September 29: board approval, negotiations with lawyers and underwriters, and thorough due diligence investigation by underwriters. ¶140. For Berkshire to buy securities in a public company with substantial analyst coverage like GE is routine business, not requiring board approval or due diligence by underwriters. Indeed, investing based on non-public information is insider trading.

[17] While GE's motive to conceal the offering was not futile (indeed, it was successful), even if it were, the SAC alleges specific motive because there is no legal requirement that a scheme to defraud be of the sort that can be carried out successfully. *See Robbins v. Morre Med. Corp.*, 788 F. Supp. 179, 191 n.8 (S.D.N.Y. 1992) (rejecting argument that alleged scheme was "irrational for defendants to follow," and ruling that "irrational schemes have as much potential to defraud investors as do rational schemes"); *U.S. v. Simon*, 425 F.2d 796, 809 (2d Cir. 1969) ("men who find themselves in a bad situation of their own making do not always act with full rationality").

so obvious that the defendant must have been aware of it" *Id.* (quotations omitted). Although *Kalnit* holds that "the strength of the circumstantial allegations must be correspondingly greater" if there is no motive, the SAC does allege motive. 264 F.3d at 142. Moreover, the allegations of knowing or reckless misconduct here, standing alone, strongly infer scienter.

Defendants assert that to allege strong circumstantial evidence that on September 25 Defendants planned to hold the offering, Plaintiffs must specifically identify reports or statements containing this information. MTD at 20-21. *Novak* explains that "[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information," and refers to the subject matter of the reports or statements as "data." 216 F.3d at 309; *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 495 (S.D.N.Y. 2001) (recklessness may be established where "some factual basis" for what the defendant knew or should have known exists, and does not require reference to "internal company reports" or similar forms of information). The SAC does not have to identify statements or reports that GE had a plan to do an offering as the plan was not "data" that could be found, and as Defendants purposely hid the plan from others–such data might only be found by reading their minds. Moreover, the SAC alleges facts demonstrating that Defendants were working on the offering at the very time they denied planning an offering. ¶¶128-40.

Defendants claim that GE's decision to complete the offering on October 1 just a few days after GE announced on September 25 it would not raise equity, resulted from changing their minds "when volatility in the financial markets continued, if not worsened, and political uncertainties increased." MTD at 28-29. Defendants claim GE decided to raise equity because WaMu failed in the biggest U.S. bank failure in history, Congress did not reach agreement on the bail-out, and financial markets underwent unprecedented upheavals and volatility, in which GE's stock fell 8.5% on September 29, and the S&P 500 dropped 8.8% the same day. MTD at 3, 9.

21

GE's explanation for the $17 billion in new equity financing is incredible, given Defendants' statements on September 25 as to the strength of GE's capital base. Given the unceasing tumult in the financial markets over the preceding months, none of the events that occurred after September 25 was in the least bit extraordinary. In fact, the **one constant was the extreme volatility that had plagued financial markets since early September** when AIG's troubles first came to light. ¶131. For example, GE shares dropped 8% on September 15 and 6.7% on September 17. ¶¶36, 40. GE shares also dropped 8.6% from opening on September 19 to closing. ¶50. GE shares dropped another 4.6% on September 23 as investors fled financial stocks. ¶58. That **Defendants expected financial markets to remain turbulent well after September 25** is evidenced by Immelt's CNBC interview just after the September 25 call:

> **<Melissa Francis>**: Yeah. You said you don't expect the financial services market to improve in the near future was the quote that everyone was carrying today. Can you give us any more color on the timing on that?
> **<Jeffrey Immelt>:** Trish, really, I would say our treasury team and our business leaders have been working the last couple of weeks, you know, since the world has kind of gone crazy saying okay, where are we and what's going on? What do we see and what kind of trends? Here's what we're seeing in Q-3, there is no reason at all to assume it's any better in Q-4. Let's not make any more projections in Q-4 that's any different than right now. That's where we are. If liquidity comes back then we can change but right now it is what it is today.

¶133. Thus, on September 25 Defendants expected continued market volatility. GE's explanation for reversing course and issuing $12 billion of equity--because of volatility in the financial markets--is clearly false.

During the September 25 call, Defendants did not caution investors that GE's decision not to raise new equity was based on or tied to "if, when and in what form the U.S. government's proposed Emergency Economic Stabilization Act of 2008 (the "EESA") will be enacted"--the reason Defendants gave for holding the offering in GE's prospectus filed with the SEC on October 1. ¶¶130-32. If Defendants' September 25 statements were based on the assumption that

22

Congress would approve bail-out legislation, Defendants should have expressed that contingency. Defendants' claim that they decided to raise $15 billion in equity during the four business days after September 25 because of the failure of WaMu, the sale of Wachovia and Congress' continued debate over the bail-out plan is incredible, as these events just continued the long string of unprecedented calamitous events in the U.S. economy. Nothing changed to warrant GE's immediate about-face. ¶¶24-60. A cascade of catastrophes in the financial services sector occurred in a three-week time span before September 25 when GE announced its balance sheet was strong and liquidity was sufficient, and that it had no need or intention to raise debt or equity. Defendants' statement that these three events inspired a tectonic reversal in GE's financial plan such that GE suddenly decided to raise $15 billion of equity is not credible.

Moreover, the market knew as early as September 12 that WaMu was in trouble and likely to fail if no acquirer were found. ¶¶30, 38. WaMu's failure was no surprise and should not have affected GE's liquidity plan. ¶48 (On September 19 the International Herald Tribune reported that WaMu, unable to raise much needed capital, had put itself up for sale, reversing its statement from the prior week that it would be able to survive on its own); ¶57 (The Financial Times reported on September 23 that WaMu "was under mounting pressure from regulators yesterday to reach a deal with prospective buyers that would put the beleaguered U.S. bank in stronger hands. . . If no outright buyer emerges in the coming days, the regulator could push to broker a deal that would split WaMu between several banks"). Also, JPMorgan's acquisition of WaMu's assets actually provided investors a sense of relief in that the potential fallout from the bank failure was minimized. Markets took the WaMu failure in stride. ¶94.

GE's reasons for deciding to raise equity--because of GE's stock drop of 8.5% and news of Congress' heated debates over the bail-out plan on September 29–are clearly false because on September 30 Congress agreed it would soon finalize a bank rescue package. ¶97. Furthermore,

on September 30, the U.S. stock market rebounded vigorously on the good news, and GE's share price rose by 10.4%–increasing more than it dropped the previous day. ¶97.

Thus, Defendants' false explanation as to why they decided to raise $15 billion in equity is sufficient circumstantial evidence that their September 25 denial of their plan to raise equity was made with knowledge that it was false, or at least, recklessly. *Carlson v. Xerox Corp.*, 392 F. Supp. 2d 267, 285 (D. Conn. 2005) ("Exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force.").

On September 14 and September 25, Defendants assured investors that, contrary to market rumors, demand for GE's commercial paper remained strong. ¶¶62, 70, 82. In his recent memoir, former Treasury Secretary Paulson states Immelt confided in him on September 8 and 15 that GE could not sell commercial paper for any maturity longer than over-night. Brown Decl. at 3, Ex. 1. Secretary Paulson found this startling. *Id.* Defendants' indisputably false statements that demand for GE commercial paper remained strong, in the face of Immelt's private statements to Secretary Paulson to the contrary, proves Defendants' knowingly misrepresented GE's need for additional equity to: (1) avert a liquidity crisis, (2) continue issuing commercial paper, and (3) preserve GE's ability to complete the offering on advantageous terms.

Defendants' conscious misbehavior or recklessness is also evident in that GE subsequently contradicted their September 25 statement that GE would accomplish its liquidity plan without selling equity. It is now apparent that GE could never have achieved the financial plan it announced on September 25 without the funds received in the October 1 equity offering–further demonstrating GE had planned the offering prior to September 25. In the September 25 call, Sherin stated that GE planned to strengthen the balance sheet by reducing GE Capital's leverage ratio from 7.2:1 to 6:1 by the end of 2008. ¶71. Sherin explained that GE would achieve its goals of reducing leverage from 7.2:1 to 6:1 by the end of 2008 without selling new equity or

24

debt. ¶72. Yet in a press release issued on January 23, 2009, Immelt stated, "We used $5.5 billion of our equity offering to meet our stated GE Capital debt-to-equity leverage goal of 7:1 by the end of 2008." ¶116. Defendants are wrong that Plaintiffs here plead "fraud by hindsight." MTD at 24. Even after raising $17 billion of additional equity, GE was still unable to reduce GE Capital's leverage to 6:1 and meet its September 25 liquidity plan by the end of 2008. In fact, after applying $5.5 billion of its "unanticipated" equity offering to pay down debt, GE Capital's leverage was still 7:1 on January 23, 2009. This suggests that as of September 25, Defendants' anticipated the $15 billion offering as being part of their overall financial plan to reduce leverage. GE's September 25 statement that it would achieve its financial plan without raising equity was false.[18]

Defendants' conscious misbehavior or recklessness is also inferred from the timing of the conference call on September 25. Ordinarily, GE would not hold an unscheduled conference call and revise its earnings estimates on September 25 with only one week left in the fiscal quarter, as the quarter was almost complete and actual earnings would be released and estimates revised in two weeks. One of GE's primary unspoken reasons for the call was to revise GE's earnings estimates in advance of the soon-to-be-disclosed October 1 offering. Absent its plan to hold the

---

[18] The SAC thus has pleaded GE's distressed financial condition--caused by lack of cash and its rising costs in issuing commercial paper. However, the amount of the discount of the shelf offering is irrelevant to determining whether the SAC has pleaded GE's financial condition was distressed. *See* MTD at 21-22 (arguing that because they deem the discount in the pricing of the offering to be normal, the allegation that GE was in a distressed condition fails). What infers Defendants' conscious misbehavior and recklessness is that they knew on September 25 that GE was in a financially distressed condition, and that at that time they planned a public offering to remedy that condition. Regardless, as a Triple A stock, GE's shelf offering should not have been discounted, certainly not at the rate of shelf offerings of the distressed banks Defendants cite. MTD at 12-13. Also, Defendants do not state how the fact that the exercise price of Buffet's warrants was the same as the offering price has any bearing on how GE was distressed; the cause and effect relationship of the two, if any, is unknown. Moreover, that Buffet purchased $3 billion of GE stock does not indicate GE was not distressed. Indeed, GE sweetened Buffet's stock purchase with warrants to purchase $3 billion of common stock at a discount.

offering, GE was not required to revise its earnings estimates on September 25. GE revised its earnings estimates downward on that call because otherwise GE would face potential liability for securities fraud from purchasers in the October offerings for not disclosing that GE's earnings were below previously issued estimates. Had GE simply disclosed the lowered earnings guidance in the offering prospectus, the negative surprise would have had a devastating effect on the offering. Moreover, even if GE was to privately disclose its lower earnings guidance to Berkshire prior to the offering, Berkshire would have wanted to wait until after the revised earnings were publicly announced before pricing and completing its stock purchase, as the risk of GE's stock price declining upon subsequent public disclosure was high. ¶¶124-27. Defendants' argument that they could not have held the call to avoid liability for non-disclosure of revised earnings estimates while knowingly incurring liability for non-disclosure of a planned equity offering misses the mark. MTD at 22. Defendants presumably did not plan to violate securities laws by not disclosing the offerings--as they did not know that they would be asked directly in the call whether they planned an offering. Thus, Defendants did not choose between having the call to meet earnings estimate disclosure requirements and avoiding liability by admitting there would be an offering. Once they were asked that question, they chose to lie, finding there was more to lose in disclosing the offering than in concealing it. Defendants' decision was coldly logical: §10(b) liability on a class period of five trading days pales in comparison to §12 liability on a $15 billion offering.

It is incredible that GE could have arranged for the second largest public offering in U.S. history in four business days. Looking closer, the preliminary prospectus states GE's decision to hold the offering was based on "uncertainty as to if, when and in what form the U.S. government's proposed Emergency Economic Stabilization Act of 2008 (the "EESA") will be enacted." ¶130. But, it was not until September 28 that the House hesitated to pass the bill. GE's

story requires believing that when GE heard the bill was held up, the market was down 8.8% and GE stock was down 8.5% on September 29, Defendants suddenly decided to change their plan and arranged a $12 billion equity offering--all in two days. ¶¶96, 158.

Defendants miss the point in citing several experts who opine that shelf offerings can be priced and marketed in one or two days. It's not the pricing and marketing that requires more than 24 hours. It's the necessary preparation for the $12-14 billion equity offering that requires substantial lead-time. **Prior** to announcing the offering on October 1 and pricing and marketing it, GE had to arrange for a board meeting on one-day's notice for some of the most prominent business persons in the U.S., **then** get board approval, **then** negotiate with lawyers and underwriters, and **after that** the underwriters had to conduct and **then** complete a thorough due diligence investigation on one of the largest stock offerings in history–in less than two days.[19] ¶140. Obviously the Defendants set into motion and the GE board approved the public offering long before September 29, and underwriters began due diligence long before as well.

*In re Worldcom, Inc. Securities Litigation*, in analyzing an underwriter's due diligence responsibilities in connection with a shelf offering by a well known seasoned issuer such as GE, explains that "Section 11(b) plainly commands that underwriters conduct an investigation as to portions of a registration statement not made on the authority of an expert." 346 F.Supp.2d 628, 678 (S.D.N.Y. 2004). "Today, as in 1933 when Section 11 became law, the word 'investigation' connotes a 'thorough' or 'searching inquiry.'" *Id.* (quoting *Smith v. U.S.*, 508 U.S. 223, 228 (1993)). At the time Rule 176, providing for integrated disclosure, was finalized, "the SEC took care to explain that integrated disclosure was intended to 'simplify disclosure and reduce unnecessary repetition and redelivery of information,' not to 'modify the responsibility of

---

[19] As discussed above, companies generally announce shelf offerings immediately before executing them in order to avoid market volatility, but companies *decide* to hold shelf offerings much earlier than when they announce them.

underwriters and others to make a reasonable investigation.'" *Id.* at 669 (quoting SEC Rel. 6335, 1981 WL 31062, at *10 (Aug, 6, 1981)). "As recently as December 1998, the SEC recalled that it 'expressly rejected the consideration of competitive timing and pressures when evaluating the reasonableness of an underwriter's investigation.'" *Id.* at 670 (quoting 63 Fed. Reg. at 67231). *WorldCom* holds that underwriters must do as thorough due diligence for a shelf offering as for any other offering, and relies on *Escott v. BarChris Constr. Corp.*, 283 F.Supp. 643 (S.D.N.Y. 1968), and *Feit v. Leasco Data Processing Equip. Corp.*, 332 F.Supp. 544 (E.D.N.Y. 1971), among other decisions, for what constitutes sufficient due diligence. *Id.* at 685 ("The processes through which and the timing in which due diligence is performed have changed, but the ultimate test of reasonable conduct in the specific circumstances of an offering remains unchanged").

    *WorldCom* emphasizes that "[n]o greater reliance in our self-regulatory system is placed on any single participant in the issuance of securities than upon the underwriter" *Id.* at 662 (quoting *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973)). *BarChris* holds that underwriters had not conducted "reasonable investigation of the truth of those portions of the prospectus which were not made on the authority of [the auditor] as an expert" because they made "almost no attempt to verify management's representations." 283 F.Supp. at 697. The underwriters' investigation in *BarChris* included perusing annual reports and prospectuses of other companies in the industry, the issuer's prior prospectuses, annual reports and recent unaudited interim financial statements, as well as its major contracts and prior minutes; and attending meetings with the issuer at which underwriters and underwriters' counsel asked "pertinent questions and received answers which satisfied them" and in which "extensive, successive proofs of the prospectus were considered and revised." *Id.* at 693-95.

    In *Feit*, the underwriters had "'just barely' satisfied this standard by completing a 'thorough review of all available financial data,' including an examination of the issuer's audit,

'searching inquiries' of the issuer's major bank, and a study of the issuer's corporate minutes, records, and major agreements; attending due diligence meetings at which the proposed registration statement was reviewed 'line by line'; reviewing correspondence pertinent to the omission at issue; and remaining in 'constant contact' with the issuer." *WorldCom*, 346 F. Supp. 2d at 675 (quoting *Feit*, 332 F.Supp. at 582-83).

In *WorldCom*, the underwriters' due diligence for the shelf offerings involved conference calls with WorldCom's management and auditors, and review of WorldCom's board minutes, SEC filings, press releases and other documents. 346 F. Supp. 2d at 647-48, 652-53. The *WorldCom* court, however, found there were questions of fact as to whether the reasonable investigation standard was met, and therefore denied the underwriters' motion for summary judgment with respect to the misstatements in the interim financial statements.

The most reasonable inference is that GE's underwriters and their lawyers were familiar with the requirements for due diligence set forth in *Worldcom* and these other cases and followed those rules. The underwriters' investigations in *Feit*, *BarChris*, and *WorldCom*, the latter two of whose due diligence was insufficient, was surely more thorough than what Goldman could have done on GE in 2 business days (Sept. 29-Oct. 1). Under *WorldCom*, *BarChris*, and *Feit*, in order to do the required due diligence pursuant to Section 11, Goldman must have at least reviewed and **analyzed** GE's prospectus, annual reports, quarterly reports, board minutes, had **meetings with GE's counsel and management**, **interviewed GE management**, **reviewed major contracts**, **reviewed the value of GE's loan portfolio and mortgage assets** and **met with major clients of GE**–**and must have not simply relied on the assurances of GE management**. Also, when liquidity and bad debt were plaguing the economy, and when credit analysts could not determine the value of GE's $650 billion of financial assets, including its loan portfolio and mortgage backed securities assets, Goldman's review was sure to require more

29

involved due diligence than in ordinary times. SAC, Ex. 1, p.10 ("$300 to $500 million in mark-to-market pressure" over and above $270 million GE booked in the first quarter). The Court should infer that the underwriters properly exercised their responsibilities under the federal securities laws and performed more than 48 hours of due diligence. The proper inference is that Goldman did thorough due diligence–which would have required it to have commenced its investigation well before September 25.[20]

It is also unlikely that GE's board approved the offering in the two days after GE claimed it changed its mind. As Defendants admit, special meetings of GE's board require at least two-days notice. MTD at 23. Although Defendants suggest the two-days notice can be waived (Defendants' Ex. M at 3), they do not state that a waiver of notice was obtained from each director. Moreover, there is no evidence a special meeting was even held, as neither the Prospectus nor GE's other public statements mentions one. *See* Defendants' Ex. J.

Defendants assertion that it is implausible to believe that GE could be implicated in a securities fraud is contradicted by the SEC's recent filing of a complaint accusing high-level GE executives of orchestrating a two-year long securities fraud by violating GAAP so as to increase

---

[20] The Court must strike Defendants' statement that Goldman "had, just weeks earlier, done due diligence in connection with underwriting $100 million of General Electric Capital Corporation's senior unsecured rate notes" (MTD at 23), in addition to Defendants' submission of Exhibit K referencing the same. Defendants propose that the Court let them choose to present certain facts that they think suggest they did not plan the offering on September 25, without submitting to full-fledged discovery--in which Plaintiffs expect to find concrete evidence corroborating the SAC. Why don't Defendants also submit evidence on what due diligence Goldman did for the $14 billion offering, and on when Goldman did it? Notwithstanding that the Court may not consider that Goldman was an underwriter for an offering several weeks prior, even if Goldman did some due diligence there, the type of due diligence would have been vastly different from that required here. That was an offering of **debt**, and this was an offering of **equity**. The size of that offering was **1/150** the size of this offering. Moreover, that was an offering done by GE Capital, which is a subsidiary of GE. Thus, the extent of due diligence required of Goldman for the $15 billion offering was not mitigated at all if it did a $100 million debt offering for GE Capital before. If the extent of due diligence required of Goldman was affected at all by the bond offering, it could have only been reduced immaterially.

earnings and avoid reporting negative financial results. On August 10, 2009, the District Court entered a consent judgment enjoining GE from further violating the federal securities laws and ordering GE to pay $50 million. ¶¶176-79.[21] Defendants' contention that GE is above reproach is belied by the consent order and GE's payment of a $50 million civil penalty.[22]

The inference of Defendants' scienter is compelling as the September 25 call preceded the October 1 announcement of the $15 billion offering by only 4 business days. *Helwig v. Vencor, Inc.,* 251 F.3d 540, 552 (6th Cir. 2001), citing *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 196 (1st Cir. 1999), (holding that allegations sufficient to support an inference of scienter include, *inter alia*, (b) "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"). GE's announcement of the offering is nearly contemporaneous with Defendants' false statements denying the offering. Also, the magnitude of Defendants' misstatement, that GE would not hold the second largest offering in U.S. history, is another compelling indicium of Defendants' scienter–"oops, we're $15 billion short this quarter."[23]

---

[21] Defendants have a pattern of making statements that are soon proven false by their actions and subsequent statements. They have also made a habit of blaming their misstatements on unpredictable market conditions. This raises a strong inference that Defendants' September 25 statements were not innocent mistakes. ¶¶180-202.

[22] Defendants' argument that the SAC's allegations depend on GE employees, Goldman and Buffet conspiring to commit fraud is wrong. MTD at 25-26. The complaint accuses only Mr. Sherin and Mr Immelt of lying—not that anyone else knew they would lie during the conference call. There is no basis to conflate their misrepresentations on the call with the actions of anyone else. That others stood silent after Sherin and Immelt lied doesn't prove they didn't lie. Fear of crossing the CEO and CFO or the fear of GE's imminent collapse may have prevented any action. Defendants intone the legend of Buffet, making a new defense no court has ever entertained: innocence and credibility by association. Their defense amounts to nothing more than claiming "We are respectable businessmen. Look who we associate with. We would never do such a thing. Who do you believe, them or me?" Moreover, Buffet is not liable for GE's false statements, and has no duty to correct them.

[23] *See Rothman,* 220 F.3d at 92 (company's 84% write-off of royalty advances was a "significant" factor in finding scienter); *In re Winstar Communications,* 2006 WL 473885, at *7

The most compelling inference is that on September 25 GE planned to raise equity to reduce leverage to its stated goal of 6:1, and, that long before then, GE's board approved the offering and Goldman conducted due diligence. Defendants' non-culpable explanation is at best possible–but not plausible; it is highly unlikely and the least likely of competing explanations. Even if a reasonable person were to somehow deem it **possible** that on September 25 GE did not plan to raise equity, and was able to accomplish all necessary preliminary work in less than two days, a reasonable person would consider it highly **unlikely** that is what actually happened. Defendants non-culpable "it was *possible* for it to happen" scenario is no match for the much more plausible culpable explanation advanced by Plaintiffs. This is particularly true since Defendants only pose *possibilities* as to what *could* have happened, yet never actually state on the record what *did* happen. The SAC's allegations of scienter are "cogent and at least as compelling as any opposing inference of nonfraudulent intent." 127 S. Ct. at 2505.

### 3. **The SAC Pleads Loss Causation**

Defendants' misstatement that GE had no plan or need to raise equity financing is the proximate cause of investors' losses. When GE announced the discounted pricing for the offering and its dilutive nature, its stock price dropped immediately to the discounted price. ¶¶108-10.

There are "two requirements necessary to establish loss causation: 1) the loss must be foreseeable, and 2) the loss must have been caused by the materialization of the concealed risk. *Lentell v. Merrill Lynch & Co., Inc.* 396 F.3d 161, 172-73 (2d Cir. 2005). In order to satisfy the foreseeability prong, a plaintiff must prove that the risk "'was within the zone of risk concealed by the misrepresentations and omissions alleged by the disappointed investor.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.,* 574 F.3d 29, 40 (2d Cir. 2009), quoting *Lentell,* 396 F.3d at

---

(S.D.N.Y. Feb. 27, 2006) ("Other evidence that may be considered in establishing scienter is the magnitude of the overstatement of revenue and earnings . . .").

173. The SAC pleads loss causation because it alleges: (1) Defendants knew that GE might price the $12 billion equity offering at a discount-to-market, and (2) GE's offering $12 billion of stock at a 9.6% discount caused GE's stock price to decline 9.6% on October 2, 2008. ¶¶110-11.

Defendants' judicially admit that rapidly executed shelf offerings are typically sold at a discount--a larger discount than ordinary offerings. MTD at 12. As a well-known seasoned issuer, GE must have been aware of this fact. That market conditions <u>may</u> have contributed to the need for, or severity of, the discount does not break the chain of causation. Defendants told investors that, despite the worst market conditions in recent history, GE had no plan or need to raise equity financing. ¶79. Defendants also judicially admit they knew there was an increased likelihood that a secondary offering would be priced at a discount to GE's current share price due to volatile market conditions. MTD at 12. The foreseeable stock price decline resulted from the misrepresented fact, i.e., that GE would not do an equity offering.

Defendants contend that on October 1, upon the announcement, the market should also have foreseen the offering would be priced at a discount, and yet, GE's stock price went up. Defendants assert this shows concealment of the offering was not the cause of the stock drop on October 2. This conflates <u>Defendants' ability</u> on September 25 to foresee the **"risk"** of a stock price decline resulting from the equity offering with <u>investors' ability</u> to predict, and their appetite to gamble on, whether and to what extent the offering price would be discounted from the current market price. Defendants can be held liable for simply being aware of the risk of misleading the market. If Defendants are aware there is a 50% chance of a price decline in the offering, it is foreseeable and proximate cause is established. The  market's reaction is viewed under the prism of the total mix of information available. Market participants might simply view a 50% chance of a price decline as an insufficient reason to sell GE stock because there is an equal chance of a price increase. Defendants' contentions are completely speculative. Indeed,

33

upon announcement of pricing, GE's stock price immediately declined almost exactly to the offering price--demonstrating the direct link between the offering and the price decline. ¶108.[24]

Another reason GE's share price rose slightly, rather than declined immediately on October 1 when the $12 billion public offering was announced was because GE simultaneously announced that Buffet was investing $3 billion in GE. This Buffet "Premium" stabilized GE's stock, which would likely have declined but for Buffet's endorsing investment in GE. ¶¶105-06. GE's stock price did not decline immediately upon news of the offering because of Buffet's co-investment, and investors did not yet know that the offering would be at a steep discount. ¶106. Investors drove the price down on October 2 when GE announced the discounted price for the offering. ¶107.

The "subject of the fraudulent statement or omission" was the $12 billion offering. Its discounted pricing was within the "zone of risk" of the offering, and it directly caused GE's stock-price drop.[25] This satisfies loss causation pleading requirements. *Lentell*, 396 F.3d at 173.

### 4. <u>Failure to Specify Misleading Statements</u>

Defendants pretend they cannot discern which of their statements quoted in the SAC are alleged to be false and misleading and that many of the statements are just corporate optimism. First, paragraphs 8-10 concisely summarize the core allegations of the SAC: Defendants

---

[24]    That the Dow declined 25% from September 1, 2008 to October 10, 2008 says nothing about the cause of GE's stock price decline on a single trading day–October 2, 2008. Only a regression analysis and event study by a financial expert can prove that the October 2 price decline was caused by a general market decline, rather than the $12 billion equity offering. *In re Vivendi Universal, S.A. Sec. Litig.*, 634 F.Supp.2d 352, 364 (S.D.N.Y. 2009).

[25] Defendants note that "Plaintiffs do not account for the fact that the public offering price was set at the same level as the exercise price of Berkshire's warrants." MTD at 31. Whether GE set the warrant exercise price at the anticipated offering price, or investors in the offering refused to pay more for GE shares than the warrant exercise price, or the prices matched coincidentally, does not alter the loss causation analysis under *Lentell*.

misrepresented that GE was not in need of equity financing, when it was in the process of arranging $15 billion in equity offerings.[26]

### 5. **Pre-Class Period Statements**

Defendants argue they're not liable for pre-class period statements, citing ¶¶176-201. The SAC does not assert liability for those statements. Those paragraphs show Defendants' pattern of issuing disclosures that were subsequently shown to be misleading. Indeed, the SEC complained that GE committed securities fraud, and GE consented to a $50 million judgment against it. ¶¶176-79. In other instances, analysts questioned Defendants' good faith in issuing statements. ¶195. As a result, Defendants suffer "credibility gap." ¶¶192, 199.

### 6. **The SAC Pleads Control Person Liability**

As the SAC pleads a primary violation, it pleads Immelt and Sherin are liable under §20.

### III.    **CONCLUSION**

For the reasons stated above, the Court should deny Defendants' motion to dismiss.

Respectfully submitted,

Dated: February 12, 2010             **THE ROSEN LAW FIRM, P.A.**

_____/s/ Laurence Rosen_____
Laurence M. Rosen, Esq. (LR 5733)
Timothy W. Brown, Esq. (TB 1008)
Phillip Kim, Esq. (PK 9384)
350 Fifth Avenue, Suite 5508
New York, New York 10118
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
Email: tbrown@rosenlegal.com
Email: pkim@rosenlegal.com

Lead Counsel for Plaintiffs and the Class

---

[26] Other paragraphs also delineate which statements are false and misleading. ¶¶89, 109.

35

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2010, a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED COMPLAINT was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Timothy W. Brown

36