UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

| | | |
|---|---|---|
| DALE WATERS, WESTERN HEART | : | |
| INSTITUTE, P.C., RETIREMENT PLAN, | : | |
| Individually and on Behalf of All Others | : | |
| Similarly Situated, | : | 08-CV-8484 |
| Plaintiffs, | : | (RJS) |
| | : | |
| against | : | |
| | : | |
| GENERAL ELECTRIC COMPANY, | : | |
| JEFFREY R. IMMELT and KEITH S. | : | |
| SHERIN, | : | |
| | : | |
| Defendants. | : | |

-----------------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE THIRD AMENDED CLASS ACTION COMPLAINT

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
*Counsel for Defendants*
*General Electric Company,*
*Jeffrey R. Immelt, and Keith S. Sherin*

April 14, 2010

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................... 1

ARGUMENT ....................................................................................................................... 4

I.    The Complaint Fails To Allege Facts that Give Rise to a Strong Inference of
      Scienter .................................................................................................................... 4

      A.    The Complaint Still Fails To Allege Any Recognizable Motive......................... 4

      B.    The Complaint Still Fails to Allege Conscious Misbehavior or
            Recklessness .................................................................................................. 9

      C.    The Complaint Still Fails To Satisfy Tellabs.................................................... 12

II.   The Complaint Fails to Allege Loss Causation .................................................... 18

III.  The Complaint Fails To State A Claim Under Section 20(a) ........................................ 20

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

## CASES

Page(s)

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 2005)........................................5, 11

Amida Capital Mgmt. II, LLC v. Cerberus Capital Management, L.P.,
 669 F. Supp. 2d 430 (S.D.N.Y 2009)..............................................................11

In re AstraZeneca Sec. Litig., 559 F. Supp. 2d 453 (S.D.N.Y. 2009),
 aff'd sub nom. State Univ. Ret. Sys. of Ill. v. AstraZeneca PLC, 334 Fed. App'x
 404 (2d Cir. 2009)........................................................................................5, 6

Darquea v. Jarden Corp., 2007 WL. 1610146 (S.D.N.Y. May 31, 2007),
 aff'd on reconsideration, 2007 WL 2584744 (S.D.N.Y. Sept. 5, 2007)...............................8

Denny v. Barber, 576 F.2d 465 (2d Cir. 1978) ...........................................................11

Dura Pharms., Inc. v. Broudo, 544 U.S. 336 (2005)...................................................19

ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d
 187 (2d Cir. 2009)........................................................................................4

Fant v. Perelman, 1999 WL. 199078 (S.D.N.Y. Apr. 9, 1999) ....................................11

In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29 (2d Cir. 2009) ...................19

In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432 (S.D.N.Y. 2005).......................6

In re Int'l Bus. Machs. Corp. Sec. Litig., 163 F.3d 102 (2d Cir. 1998)........................12

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ............................................................6

Kramer v. Time Warner, Inc., 937 F.2d 767 (2d Cir. 1991)........................................15

Laborers' Pension Fund v. Blackmore Sewer Const., Inc.,
 298 F.3d 600 (7th Cir. 2002) .........................................................................14

Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147 (2d Cir. 2007) .............................19

Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).............................4, 18, 19

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
 568 F. Supp. 2d 349 (S.D.N.Y. 2008).............................................................19

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272 (S.D.N.Y. 2009)................................5

In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510 (S.D.N.Y.),
    aff'd sub nom., Condra v. PXRE Group, Ltd.,
    2009 WL 4893719 (2d Cir. Dec. 21, 2009) ...............................................................6, 16

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000)..............................................................6

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., 75 F.3d
    801 (2d Cir. 1996)...........................................................................................4, 5

Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124 (2d Cir. 1994) .................................16

South Cherry St. L.L.C. v. Hennessee Group L.L.C.,
    573 F.3d 98 (2d Cir. 2009).................................................................................3, 12

Staehr v. Hartford Fin. Servs. Group, 547 F.3d 406 (2d Cir. 2008) .............................15

Tellabs, Inc. v. Makor Issues and Rights Ltd., 551 U.S. 308 (2007)............................1, 3, 7, 8, 12

In re Time Warner Inc. Sec. Litig., 9 F.3d 259 (2d Cir. 1993).........................................3, 6, 7, 8

**STATUTES**

Fed. R. Evid. 201(b), (d) ...............................................................................................14

**BOOKS & ARTICLES**

Shefali Anand & Diya Gullapalli, The Financial Crisis: Bailout of Money Funds Seems
    to Stanch Outflow, Wall St. J., Sept. 20, 2008, at A2......................................................14

Rachel Layne, GE's Immelt Disagrees With Paulson's Memory of Talks, Bloomberg,
    Feb. 11, 2010,
    http://www.bloomberg.com/apps/news?pid=20601108&sid=aZzcAxzDhlPo .............2, 12

Prabha Natarajan, Investors Jump Into Commercial Paper, Cheered By US Tsy Plan,
    Dow Jones, Sept. 19, 2008....................................................................................14

Prabha Natarajan, Commercial Paper Mkt Operating 'Smoothly' -Trader,
    Dow Jones, Sept. 23, 2008....................................................................................15

## TABLE OF AUTHORITIES (continued)

**Page(s)**

Henry M. Paulson, On the Brink: Inside the Race to Stop the Collapse of the Global
Financial System (2010) .............................................................................................1, 12

Press Room, Department of the Treasury, Treasury Announces Guarantee Program for
Money Market Funds, Sept. 19, 2008,
available at http://www.ustreas.gov/press/releases/hp1147.htm .......................................14

Anusha Shrivastava, Commercial Paper Still In Demand, But Rates Higher,
Dow Jones, Sept. 17, 2008...............................................................................................15

## PRELIMINARY STATEMENT

Defendants' opening memorandum ("Def. Mem.") showed that the Second Amended Complaint should be dismissed because it failed to adequately plead both scienter and loss causation. As a dispositive threshold issue, Plaintiffs failed to plead loss causation because they alleged only that the *fact* of GE's October 2008 equity offering was concealed, but it was the *price* — not the fact — of the offering that supposedly caused Plaintiffs' losses, and Plaintiffs conceded that GE could not have known the price of the offering until immediately before the shares were sold on October 2. Plaintiffs' core scienter allegation was also unavailing. Plaintiffs alleged that Defendants lied to investors on a September 25, 2008 conference call when they supposedly concealed plans to conduct the equity offering. Defendants' alleged motives for doing so were to keep GE's stock price high, avoid dilution, attract a lead investor, and effect the offering on advantageous terms. But Defendants showed that these allegations amounted to nothing more than generalized motive pleading that courts have routinely rejected. Defendants also showed that Plaintiffs failed to plead either conscious misbehavior or recklessness and that, under Tellabs, Inc. v. Makor Issues and Rights Ltd., 551 U.S. 308 (2007), Plaintiffs' allegations failed to raise a strong inference of scienter because subscribing to their allegations requires suspending disbelief in favor of several implausible inferences. Def. Mem. at 3-4; 25-29.

The only significant additions in Plaintiffs' Third Amended Complaint ("Compl." or "TAC") are allegations that rely on passages from Former Treasury Secretary Henry Paulson's book, On the Brink: Inside the Race to Stop the Collapse of the Global Financial System, in which Mr. Paulson describes certain conversations he purportedly had with GE's CEO, Jeffrey Immelt, about GE's commercial paper ("CP") program in early and mid-September

2008.  But these allegations cannot begin to cure Plaintiffs' failure to plead loss causation, which independently requires dismissal of the Complaint in its entirety.

Plaintiffs' reliance on Mr. Paulson's book also fails to resuscitate Plaintiffs' allegations with any new scienter theory.  Plaintiffs rely on Mr. Paulson's book to allege, as they have from the beginning, that concerns about liquidity and the CP market explain why GE allegedly lied to investors on September 25.  See, e.g., SAC ¶¶ 141-45.  But this allegation remains insufficient as a matter of law for at least one simple reason: it does not begin to explain why on September 25 Defendants would have concealed plans to effect an offering, only to reveal those plans four days later to an efficient market, a day before the offering was priced and effected.

Moreover, even accepting Mr. Paulson's recollections of the September 8 and 15 conversations as accurate,[1] intervening events during this period of unprecedented and unrelenting change in the financial markets sever any possible connection between the state of the CP market purportedly described in the early and mid-September conversations and the state of that market on September 25.  Indeed, on September 14, Merrill Lynch was sold in a fire sale to Bank of America, see Compl. ¶ 34; on September 15, Lehman filed for bankruptcy, see Compl. ¶ 39; on September 17 AIG teetered, see Compl. ¶ 43; and on September 19, 2008, the federal government intervened to guarantee money-market funds, see Compl. ¶ 55, causing these major purchasers of CP to return to the CP market in force.  Furthermore, publicly available data both published by the Federal Reserve Board and reported in the financial media confirm that there was no liquidity crisis in the CP market on September 25.

---

[1] GE has publicly disputed Mr. Paulson's recollection of the events of September 8 and 15, 2008. See Rachel Layne, GE's Immelt Disagrees With Paulson's Memory of Talks, Bloomberg, Feb. 11, 2010, http://www.bloomberg.com/apps/news?pid=20601108&sid=aZzcAxzDhlPo.

Plaintiffs' remaining efforts to stave off dismissal of their Complaint also fail. *First*, in attempting to evade the long line of authority rejecting the same motive theory advanced here, Plaintiffs continue to rely on In re Time Warner Sec. Litig., 9 F.3d 259 (2d Cir. 1993). But Plaintiffs have no answer to Defendants' showing that Time Warner does not apply here: Courts, including this one, have read subsequent authority as limiting Time Warner to the acquisition context; the facts of Time Warner explain why the case does not control here – the motive alleged there involved an attempt to *both* exaggerate strategic alliance prospects and inflate stock price; and Time Warner did not apply the heightened pleading standard now required under the PSLRA and Tellabs.

*Second*, Plaintiffs' conscious misbehavior and recklessness allegations still do not raise a strong inference of scienter. Plaintiffs still have not made any factual allegations regarding contemporaneous documents, reports, confidential informants, or other evidence showing that Defendants intentionally concealed an equity offering on September 25. Moreover, Plaintiffs' proffered excuse – that the evidence exists only in Defendants' "minds" – was rejected by the Second Circuit in South Cherry Street L.L.C. v. Hennessee Group L.L.C., 573 F.3d 98, 113-14 (2d Cir. 2009), controlling authority that Plaintiffs simply ignore.

*Third*, Plaintiffs have not shown that, under Tellabs, their inferences of scienter are cogent and compelling in light of competing inferences of Defendants' non-fraudulent intent. Lacking any real response to Defendants' showing, as described above, that subscribing to the Complaint's allegations requires believing "six impossible things before breakfast," Plaintiffs point out that Mr. Buffett would not have been liable for Defendants' concealing the offering. But Mr. Buffett's liability is beside the point – Plaintiffs have not addressed, much less explained, why it would be remotely plausible that Mr. Buffett would sacrifice his reputation by

investing $3 billion in a company that had allegedly just defrauded the public.

*Finally*, Plaintiffs have not only failed to plead loss causation but they have also made Defendants' argument. Plaintiffs concede that the news of the offering and the pricing of the offering are distinct. They allege that only the news of the offering was wrongfully withheld, but that only the pricing of the offering caused their alleged loss. These allegations fail to plead loss causation. See Lentell v. Merrill Lynch & Co., 396 F.3d 161 (2d Cir. 2005).

Accordingly, the Complaint, amended now three times, should be dismissed with prejudice.

## ARGUMENT

## I. THE COMPLAINT FAILS TO ALLEGE FACTS THAT GIVE RISE TO A STRONG INFERENCE OF SCIENTER

### A. Plaintiffs Still Fail To Allege Any Recognizable Motive

To allege motive to commit fraud, a complaint must allege that defendants "benefited in some concrete and personal way from the purported fraud." ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 198 (2d Cir. 2009). Plaintiffs admit that the Complaint fails to allege any concrete or personal benefit to the individual defendants, Mr. Immelt and Mr. Sherin. See Def. Mem. Exh. A, 6:11-14. And Plaintiffs have also alleged that only the actions of Mr. Immelt and Mr. Sherin are relevant to their scienter allegations.[2] Accordingly, Plaintiffs have alleged only a generalized motive to secure corporate benefits for GE, which is insufficient.

Plaintiffs unsuccessfully attempt to distinguish the cases that Defendants rely on by seizing on meaningless distinctions. Plaintiffs contend that San Leandro Emergency Med.

---

[2] See Plaintiffs' Memorandum in Opposition to Defendants' Motion To Dismiss ("Opp.") at 31 n.22 ("The complaint accuses only Mr. Sherin and Mr. Immelt of lying.").

<u>Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801 (2d Cir. 1996), should not govern here because the alleged offering in that case was done in the first week of a three-month class period.  <u>See</u> Opp. at 13.  But the timing of the offering played no role in the Second Circuit's decision.  Rather, the Court held that the alleged motive – to inflate a company's stock price in order to "maximize the marketability" of a debt offering – was too generalized: if such allegations were sufficient, the court held, "'virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'" <u>Philip Morris</u> at 813-14 (quoting <u>Acito v. IMCERA Group, Inc.</u>, 47 F.3d 47, 54 (2d Cir. 1995)).  Moreover, the allegations of the TAC are closer than the allegations in earlier versions to the motive allegations rejected in <u>Philip Morris</u>.[3]

Plaintiffs similarly and erroneously seek to distinguish <u>In re NovaGold Res. Inc. Sec. Litig.</u>, 629 F. Supp. 2d 272, 304 n.24 (S.D.N.Y. 2009), which held that motive to "keep the stock price high to minimize the dilution of [a company's] stock price in the secondary offering" is also too generalized, by arguing that Judge Cote's holding was dictum because she had alternatively held that plaintiffs there had improperly advanced this motive theory in their opposition memorandum, instead of in an amended complaint.  <u>See</u> Opp. at 14 n.12.  But this does not make the first holding dictum, and <u>Nova Gold</u> is persuasive and accurately articulates the law in the Second Circuit.

Finally, Plaintiffs concede that <u>In re AstraZeneca Sec. Litig.</u>, 559 F. Supp. 2d 453, 469 (S.D.N.Y.), <u>aff'd sub nom.</u>, <u>State Univ. Ret. Sys. of Ill. v. AstraZeneca PLC</u>, 334 Fed. App'x

---

[3] For example, Plaintiffs now allege that Defendants concealed purported troubles in the CP market to maintain the illusion of GE's financial health so that it could conduct the offering on "advantageous terms."  <u>See</u> Compl. ¶ 146.  <u>Philip Morris</u>, however, squarely rejected the alleged motive to maintain "the illusion of continued profitability" as a means to conduct a more advantageous offering.  <u>See</u> 75 F.3d at 813-14.

404 (2d Cir. 2009) is on point, but argue that it is distinguishable because of the length of the

class period.  See Opp. at 13-14.  But the length of the class period had nothing to do with

AstraZeneca's holding that the motive allegations were insufficient.  Rather, the court reasoned

that the alleged motive – a desire to inflate a company's stock price so the company could effect

an equity offering at a higher price – was too generalized because "[i]t is very common for

companies to have secondary placements, and any officer or director would wish the stock price

to be as high as possible during such a placement. . . . 'motives that are generally possessed by

most corporate directors and officers do not suffice.'"  AstraZeneca, 559 F. Supp. 2d at 469

(quoting Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001)).[4]

   Unable then to avoid this line of authority, Plaintiffs retreat to In re Time Warner

Inc. Sec. Litig., 9 F.3d 259 (2d Cir. 1993), and argue that it trumps all subsequent decisions.  But

Time Warner does not help Plaintiffs.  See Def. Mem. at 18-20.  First, Plaintiffs misstate

Defendants' reading of Time Warner.  Defendants do not argue that Rothman v. Gregor,

220 F.3d 81 (2d Cir. 2000) "overrules" Time Warner. Opp. at 11.  Instead, Defendants read

Rothman, as Courts including this one consistently have, to "limit Time Warner's reach to the

alleged 'desire to carry out corporate *acquisitions*.'"  PXRE, 600 F. Supp. 2d at 532 n.24

(quoting In re GeoPharma, Inc. Sec. Litig., 399 F. Supp. 2d 432, 450-51 (S.D.N.Y. 2005)).

Plaintiffs allege no similar motive here.

   Second, Plaintiffs continue to ignore that in Time Warner, the Court found that

the "*combination* of [i] the glowing reports of potential strategic alliances and [ii] the

---

[4] Plaintiffs do not attempt to distinguish In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d
510, 533 (S.D.N.Y.), aff'd sub nom., Condra v. PXRE Group, Ltd., 2009 WL 4893719 (2d Cir.
Dec. 21, 2009), in which this Court held that if scienter could be sufficiently pleaded by alleging
a motive to raise capital, "virtually any company that attempted to raise capital, especially in a
woeful economic climate, would face specious securities fraud allegations."

nondisclosure of the active consideration of a rights offering," led to an "arguable" inference of scienter. 9 F.3d at 269-70 (emphasis added). Allegations that the Time Warner defendants had concealed their active consideration of a rights offering did not establish motive alone, and Plaintiffs here have not alleged anything more. Instead, Plaintiffs incorrectly analogize the exaggerated reports of strategic alliance prospects in Time Warner to Defendants' efforts to secure Mr. Buffett's investment. See Opp. at 14 n.12, 15. But there is no analogy. An inference of fraudulent intent was "possible" in Time Warner only because defendants hoped that their reports of alliance prospects — which turned out to be exaggerated, and therefore materially misleading—would minimize the dilutive impact of a rights offering. See Time Warner, 9 F.3d at 269. Here, of course, Plaintiffs have not alleged that GE made *any* public statement, let alone any misleading statement, about Mr. Buffett before the October 1 announcement of Mr. Buffet's investment.

Third, although Plaintiffs recite the Tellabs standard, Plaintiffs refuse to admit that Time Warner, decided 14 years before the Supreme Court decided Tellabs, simply does not apply this heightened standard. Instead, Time Warner sustained inferences of scienter that were merely "arguable" and had only a "reasonable probability" of being true. Time Warner did not find the inferences of scienter cogent and compelling, as Tellabs and the PSLRA now require.

Time Warner also found scienter without weighing competing inferences of fraudulent and non-fraudulent intent, as Tellabs now requires. Plaintiffs make much of Time Warner's suggestion that the defendants in that case could have been motivated to exploit the purported possibility that markets "may not fully correct for prior misleading information once a necessary disclosure has been made." 9 F.3d at 270; see Opp. at 17. But Time Warner held only that it was "not beyond doubt" that the defendants were motivated by these possibilities, see

Time Warner, 9 F.3d at 270, and that therefore defendants' argument that the efficient market

foreclosed plaintiffs' motive theory was "insufficient to preclude all possibility" of scienter.  Id.

Time Warner did not weigh plaintiffs' remotely possible theories against the competing

inferences of non-fraudulent intent, including those drawing on efficient market principles that

underpin securities law.  Had the Second Circuit applied the analysis that Tellabs requires, it

would have come out the other way.[5]

        Accordingly, Plaintiffs have not offered a cogent and compelling theory of how

Defendants could have benefited from concealing the offering on September 25 knowing that

their lie would be exposed days later on October 1.  In their opening memorandum, Defendants

showed that on October 1, the market had the same information that it would have had if

Defendants disclosed the allegedly planned equity offering on September 25.  Def. Mem. at 27.

Specifically, the market knew on October 1 that (a) GE was planning a $12 billion equity

offering; and (b) that Berkshire Hathaway was investing $3 billion.  GE's stock climbed on that

news.  The market would have had both of these pieces of information on October 1 even if GE

had announced the allegedly planned equity offering on September 25.  Plaintiffs contend that

Defendants "ignore[] that the market's reaction to specific news does not occur in a vacuum [but

instead] the market weighs the entire 'mix of information available' at that time." Opp. at 18.

But Plaintiffs never allege what additional or different information would have been part of that

"mix of information" if GE disclosed the allegedly planned offering on September 25.

_____

[5] Plaintiffs cite Darquea v. Jarden Corp., 2007 WL 1610146 (S.D.N.Y. May 31, 2007), aff'd on reconsideration, 2007 WL 2584744 (S.D.N.Y. Sept. 5, 2007), as an example of a post-Tellabs case holding that "motive is inferred by defendants inflating stock price to consummate an offering." Opp. at 10.  But in Darquea, motive was sufficiently alleged because corporate officers stood personally to gain millions of dollars in incentive payments tied to the company's stock performance.  See 2007 WL 1610146, at *10.  Plaintiffs have conceded that neither Mr. Immelt nor Mr. Sherin had any personal motive here.  See Def. Mem. Exh. A, 6:11-14

Finally, Plaintiffs allude to GE's alleged difficulties issuing CP and claim that GE was motivated to conceal the equity offering "to prevent further widening of the credit default swap spreads and to maintain investor confidence amidst unprecedented market volatility."  See Opp. at 18.  As discussed below, Plaintiffs' allegations that GE was having difficulty funding itself by issuing CP are baseless and contradicted by the public record.  Even if true, however, these allegations at most support an inference that GE was motivated to *effect* an equity offering, but Plaintiffs do not explain how *concealing* an equity offering for a few days would have affected GE's ability to issue CP or would have narrowed GE's credit default swap spreads.

At bottom, Plaintiffs' motive theory relies on the self-contradictory and futile notion that GE was motivated to conceal the October offering in order to inflate its stock price before the offering, yet planned to reveal the offering not only a few days thereafter but also before the offering was priced and effected.

### B.    The Complaint Still Fails to Allege Conscious Misbehavior or Recklessness

As Defendants' opening memorandum showed, Plaintiffs' Second Amended Complaint also failed to plead conscious misbehavior or recklessness.  Plaintiffs alleged no particularized facts – and failed to point to any contemporaneous document, report, internal memorandum, board minute, or confidential witness – supporting their conclusory allegation that Defendants knowingly concealed the equity offering on September 25.  Plaintiffs have now yet again amended their complaint in an unsuccessful attempt to shore up their conscious misbehavior or recklessness allegations by relying on passages from former Treasury Secretary Henry Paulson's book concerning conversations he supposedly had with Mr. Immelt about GE's CP program in early and mid-September 2008.[6]  As explained below, see infra pp. 12-16, these

---

[6] "Commercial paper" refers to short-term promissory notes, usually issued by corporations.

allegations do not show conscious misbehavior or recklessness because they rely on several unsupported inferential leaps, including that: (i) a liquidity crisis existed in the CP market on September 25, when it did not; (ii) GE succeeded in concealing this crisis from everyone but Mr. Paulson; (iii) this supposed liquidity crisis caused GE to have made plans by September 25 to effect an offering; and (iv) Defendants would have hatched a futile scheme first to conceal plans on September 25 to effect an offering, then to reveal those plans on October 1 to an efficient market, a day before the offering was priced and effected on October 2.[7]

Plaintiffs' other allegations of conscious misbehavior or recklessness also fail to give rise to a strong inference of scienter.  See Def. Mem. at 20-25.  Plaintiffs continue to allege that the *timing* of the September 25 conference call gives rise to an inference of scienter because, they allege, GE held the conference call to revise earnings estimates before a planned equity offering.  See Opp. at 25-26.  As Defendants showed in their opening memorandum, this makes no sense: there is no reason why Defendants would choose to hold a conference call to avoid liability for failing to revise earnings estimates, only to incur securities law liability for concealing the offering.  Plaintiffs now maintain that Defendants had not planned to discuss an equity offering at the conference call and were surprised by the analyst's question.  See Opp. at 25-26.  But Mr. Immelt and Mr. Sherin had devoted much of their presentation to reassuring investors of the strength of GE's liquidity position and how they planned to further enhance that

---

[7] Plaintiffs also allege that on October 13 and 16, Mr. Immelt "begged" Secretary Paulson to add GE to a governmental debt guarantee program, saying that GE's exclusion from the program "put GE at a huge disadvantage, making it difficult for the company to fund itself."  See Compl. ¶¶ 131-32.  These October conversations, however, were about a completely separate issue. The governmental program they discussed had been set up to guarantee the debt issues of certain financial institutions, but did not at the time include GE.  This put GE at a competitive disadvantage, and Mr. Immelt was urging Secretary Paulson to level the playing field.

position.[8]  Given this, it cannot be seriously suggested that questions about enhancing liquidity

through an equity offering were unexpected.[9]

        Plaintiffs also revive their argument that a post-class period, January 23, 2009

statement confirms that Defendants had planned the equity offering all along, as part of their

effort to reduce GE Capital's debt-to-equity leverage.  This is fraud by hindsight.[10]

        Finally, Plaintiffs argue that they should be excused from showing any

contemporaneous evidence of GE's conscious misbehavior or recklessness because "such data

---

[8] Indeed, Messrs. Immelt and Sherin used the word "liquidity" five times during the call before the analyst's question concerning a possible equity offering.  Obviously, with GE's liquidity a central topic of discussion, it was not, as Plaintiffs implausibly assert, unexpected that the subject of equity offerings would arise.

[9] Plaintiffs also allege that the temporal proximity between the September 25 conference call and the October 2 offering demonstrates scienter, but courts have routinely held that pleading temporal proximity cannot substitute for pleading particularized facts supporting an inference of scienter.  See Fant v. Perelman, 1999 WL 199078, at *13 (S.D.N.Y. Apr. 9, 1999) ("[P]laintiffs argue . . . that what they characterize as the short period of time, approximately five weeks, between the challenged statements and ultimate full disclosure is circumstantial evidence of scienter. . . .  [T]he Court of Appeals has held just the opposite-that temporal proximity alone does not raise a circumstantial inference of fraud.") (citing Acito, 47 F.3d at 53); accord Amida Capital Mgmt. II, LLC v. Cerberus Capital Mgmt., L.P., 669 F. Supp. 2d 430, 443 (S.D.N.Y 2009).

[10] As Defendants explained in their opening memorandum, that GE used portions of the proceeds from the equity offering to help deleverage GE Capital does not show that it had always intended to do so.  See Def. Mem. at 24.  Because Plaintiffs lack any contemporaneous evidence of GE's conscious misbehavior or recklessness, they must rely on after-the-fact statements and tenuous inferences, but such conjectures do not suffice.  See Denny v. Barber, 576 F.2d 465 (2d Cir. 1978).

Plaintiffs also recycle the argument that the settlement of an unrelated SEC complaint is evidence of GE's conscious misbehavior or recklessness in this action, although neither Mr. Immelt, nor Mr. Sherin, nor anyone else alleged to be involved here was named in that complaint, which relates to accounting decisions in 2002 and 2003.  See Opp. at 35.  In addition, Plaintiffs continue to argue that Defendants suffer from a "credibility gap" relating to pre-class period statements, also unrelated to this action, that Plaintiffs allege were subsequently proved false.  See Opp. at 31 n.21, 35.  These statements are not only completely irrelevant to the fraud alleged here but there is also no evidence – and Plaintiffs do not allege any – that these pre-class period statements were in any way fraudulent.

might only be found by reading [Defendants'] minds."  Opp. at 21; <u>see</u> <u>also</u> Opp at 30 n.20

("Plaintiffs expect to find concrete evidence corroborating the SAC" in discovery).  But the

Second Circuit has specifically rejected this excuse, insisting instead that a plaintiff plead actual

facts showing a defendant's conscious misbehavior or recklessness.  <u>See</u> <u>South Cherry St.</u>, 573

F.3d at 113-14.[11]

### C.    The Complaint Still Fails To Satisfy Tellabs

Plaintiffs have still failed to plead facts giving rise to a strong inference of

scienter under <u>Tellabs</u>.  Plaintiffs now allege that Mr. Immelt's comments to Secretary Paulson

on September 8 and September 15 contradict GE's public statements about its CP program.

According to Plaintiffs, Mr. Immelt told Secretary Paulson on September 8 that GE "was having

problems selling CP," and then told Mr. Paulson on September 15 that GE "was finding it very

difficult to sell its CP for any term longer than overnight."  Compl. ¶¶ 36, 37.[12]  Mr. Paulson

---

[11] Although Defendants previously cited <u>South Cherry St.</u> for this very proposition, <u>see</u> Defendant's Reply Memorandum in Further Support of its Motion to Dismiss the First Amended Complaint at 11, Plaintiffs fail to acknowledge, much less address, this controlling authority in their opposition memorandum.

[12] Plaintiffs maintain that these alleged statements also conflict with GE's pre-class period public statements on September 14, 2008 that "GE Capital's commercial paper programs . . . remain robust."  <u>See</u> Compl. ¶¶ 36-37. But GE's pre-class statements are not actionable.  <u>See</u> <u>In re Int'l Bus. Machs. Corp. Sec. Litig.</u>, 163 F.3d 102, 107 (2d Cir. 1998) ("A defendant, however, is liable only for those statements made during the class period.").

Moreover, Plaintiffs rely on Secretary Paulson's recollection without telling the complete story. As he acknowledges in a disclaimer – which Plaintiffs conspicuously ignore – Secretary Paulson's account was based solely on recollections, not on any contemporaneous notes, and "given the high degree of stress during this time and the extraordinary number of problems [he] was juggling in a single day, and often in a single hour, there are many details [he] will never recall."  Henry M. Paulson, <u>On the Brink: Inside the Race To Stop the Collapse of the Global Financial System</u> xiv (2010).  When Mr. Immelt disputed that he and Secretary Paulson discussed GE having problems selling commercial paper during their September 2008 conversations, the former Secretary did not defend the accuracy of the accounts in his book, but referred to the book's disclaimer.  <u>See</u> Layne, <u>supra</u> note 1.

allegedly found this news troubling because GE was "the single biggest issuer" of CP and if "mighty GE" was having difficulty selling CP, then hundreds of other companies must be having difficulty as well.  Compl. ¶ 37.  From these alleged conversations, Plaintiffs make a series of inferential leaps ultimately suggesting that GE intentionally concealed a planned equity offering on September 25.  These leaps cannot be supported: the inferences are implausible on their face and publicly available data confirm that they are simply wrong.  And, even if these inferences were true, they do not provide a basis to suggest that Defendants could have gained from concealing the offering on September 25, only to reveal it to an efficient market four business days later, before the offering was priced and effected.

Mr. Immelt's alleged statements to Secretary Paulson on September 8 and 15 do not say anything about GE's plans to conduct an equity offering on September 25.  The best Plaintiffs can do is to ask this Court to infer from Mr. Immelt's alleged early and mid-September statements that on September 25, the CP market was so dire that GE must have faced a liquidity crisis and thus must have planned an equity offering by September 25.

But Mr. Immelt's alleged conversations with Secretary Paulson, occurring nearly two and three weeks, respectively, before the September 25 conference call, could not have revealed the state of the CP market at the time of that call.  As a starting point, the unprecedented volatility of the financial markets during this period foredooms inferring market conditions on a particular day from statements made weeks earlier.  After all, on September 14, Merrill Lynch was sold in a fire sale to Bank of America, see Compl. ¶ 34; and on the morning of September 15, before Mr. Immelt spoke with Mr. Paulson, Lehman filed for bankruptcy, see Compl. ¶ 39.  Thereafter the CP market in particular changed rapidly.  After the Lehman bankruptcy, several large money market mutual funds, significant buyers of CP, "broke the

buck," with their shares falling below $1.  In response, on September 19, the federal government

announced a temporary guarantee program for money market funds that shored up these funds

and brought stability to the CP market.[13]  Observers noted that this governmental intervention

reinvigorated the CP market.  See Shefali Anand & Diya Gullapalli, The Financial Crisis:

Bailout of Money Funds Seems to Stanch Outflow, Wall St. J., Sept. 20, 2008, at A2 ("The

federal bailout of money-market funds seems to have stanched the outflow of investments that

bedeviled the industry this past week and ended the economy-threatening reluctance of the funds

to buy vital commercial paper.").[14]  Accordingly, any leap that Plaintiffs wish to make about the

health of the CP market on September 25 from Mr. Immelt's alleged statements on September 8

and 15 collides with this significant governmental intervention.

Also damaging to the inferential leaps that Plaintiffs wish to make is that, as

shown by publicly available Federal Reserve Board data,[15] there was no CP-related liquidity

crisis on or around September 25.  To the contrary, during the week of September 25, the volume

of CP being issued was significantly *higher* than usual.  On September 22 and 23, CP issuances

were $185 billion and $194 billion, respectively, significantly higher than the 2008 daily average

---

[13] See Compl. ¶ 55; Press Room, Department of the Treasury, Treasury Announces Guarantee Program for Money Market Funds, Sept. 19, 2008, available at http://www.ustreas.gov/press/releases/hp1147.htm.

[14] See also Prabha Natarajan, Investors Jump Into Commercial Paper, Cheered By US Tsy Plan, Dow Jones, Sept. 19, 2008 ("The U.S. Treasury's comprehensive plan announced Friday to shore up the nation's money market funds encouraged investors to venture back into these short-term funding markets.").

[15] The Federal Reserve Board data are available at http://www.federalreserve.gov/releases/cp/ and are summarized in Exhibit A to the Declaration of Greg A. Danilow, dated April 14, 2010 ("Danilow Decl.").  This Court can take judicial notice of publicly available governmental data. See Laborers' Pension Fund v. Blackmore Sewer Constr., Inc., 298 F.3d 600, 607 (7th Cir. 2002) (taking judicial notice of information on the FDIC's website); see also Fed. R. Evid. 201(b), (d).

of $150 billion.  See Danilow Decl. Exh. A.[16]  On September 24, the day before the conference

call, $206 billion in CP was sold, more than any other day that month.  Id.  And, on September

25 itself, there were nearly $205 billion in CP issuances.  Id.  In sum, the stronger inference to

draw here, supported by Federal Reserve Board data, is that there was no CP-related liquidity

crisis on September 25.

Moreover, media reports at the time drew these same inferences,[17] announcing a

contraction in the CP market immediately after Lehman's bankruptcy, but observing that, even

then, demand for CP remained high, although maturities were shorter and interest rates were

higher.[18]  And by September 23, the media reported that the CP market was operating

"smoothly," and that while interest rates were elevated, "both credit-worthy borrowers and

not-so highly rated companies were able to find money."[19]

Beyond this, Plaintiffs do not explain why Defendants would hatch a plan on

September 25 to conceal their plan to effect an offering, only to reveal those plans, as Defendants

did, on October 1 to an efficient market, a day before the offering was priced and effected on

---

[16] The daily totals are calculated by summing up the numbers in each of the six columns.  The 2008 average is available at: http://www.federalreserve.gov/releases/cp/volumestats.htm.

[17] This Court can take judicial notice that these articles describe a recovering and "smoothly" operating CP market because they are "offered to show that certain things were said in the press," Staehr v. Hartford Financial Services Group, 547 F.3d 406, 425 (2d Cir. 2008), and that it is not only possible to infer, based on publicly available data, that there was no CP-related liquidity crisis in September 2008 but also that many market observers did in fact draw this same inference.  Similarly, on a 12(b)(6) motion, the Court in Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991), relied on newspaper articles describing the junk bond market, not for their truth, but because they articulated an alternative inference showing why scienter could not plausibly be inferred from plaintiffs' allegations.

[18] See Anusha Shrivastava, Commercial Paper Still In Demand, But Rates Higher, Dow Jones, Sept. 17, 2008 ( "Investors are continuing to buy commercial paper Wednesday morning. . . . [A] buyer's strike . . . has not materialized. . . .").

[19] See Prabha Natarajan, Commercial Paper Mkt Operating 'Smoothly' - Trader, Dow Jones, Sept. 23, 2008.

October 2.

Thus, at bottom, Plaintiffs ask this Court not only to make several unsupported inferential leaps but also to ignore several realities: (i) despite the public and closely scrutinized nature of the CP market, there were no reports of a liquidity crisis at GE or in the broader market; (ii) although the CP market was tumultuous, CP continued to be bought in significant volume before September 25; and (iii) by September 25, after federal government intervention, rather than collapsing, the CP market was robust.

Plaintiffs also fail to effectively controvert Defendants' showing that the inferences of non-fraudulent conduct are more cogent. First, one would have to believe that GE's CEO and CFO would intentionally lie, even though they concededly had no personal motive to do so, knowing that their lies would be exposed only several days later. Courts have routinely held that such contentions are highly implausible. See PXRE, 600 F. Supp. 2d at 533 ("[T]he seeming futility of Defendants' alleged scheme is relevant to the analysis."); Def. Mem. at 25-26.[20] Second, Plaintiffs offer no convincing response to Defendants' argument that crediting Plaintiffs' allegations requires believing that scores of respected actors involved in the offering – GE's independent directors, Goldman Sachs bankers, GE's inside and outside counsel, and countless GE employees – would not only have stood silent as GE perpetrated the fraud but also would have acquiesced in the filing of a false SEC registration statement.[21] Significantly, Plaintiffs also do not explain why it would be plausible – indeed, even possible – that Mr. Buffett, Wall Street's "good housekeeping seal of approval," would have jeopardized his

---

[20] See also Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1130 (2d Cir. 1994) ("[I]t is hard to see what benefits accrue from a short respite from an inevitable day of reckoning.").

[21] Plaintiffs allege that others stood silent because of "[f]ear of crossing the CEO and CFO or fear of GE's imminent collapse," Opp. at 31 n.22, but offer no factual support for this allegation.

legendary reputation by either standing idly by as GE's executives blatantly lied, or by being a pawn in GE's expansive securities fraud plot.[22]

The more compelling inference, as Defendants explained, is that although Defendants did not intend to conduct an equity offering on September 25, as volatility in the financial markets continued and political uncertainties increased, they reacted quickly and decisively to protect GE and its shareholders.  See Def. Mem. 28-29.  After September 25: Washington Mutual declared the largest bank failure in history; Wachovia's stock fell by nearly a third; the Dow suffered its largest one-day point drop in history; and Congress waffled on a bail-out plan.  To suggest that "nothing changed" and that GE's executives would fail to react to what Plaintiffs describe as a "string of unprecedented calamitous events in the U.S. economy," is surely the more incredible inference to draw here.

Plaintiffs also continue to allege that preparation for the offering could not have been completed between the September 25 conference call and October 1, primarily because Goldman Sachs likely would not have had enough time to do due diligence.  Although Plaintiffs cite several cases discussing the tasks that purportedly must be completed to effect an offering, none of these discussions, and none of Plaintiffs' allegations, demonstrate how long these steps ordinarily take.  And, as Defendants explained, the circumstances of GE's offering were far from ordinary: the underwriter was already familiar with GE's and GE Capital's financials,[23] and the

---

[22] Plaintiffs respond that Mr. Buffett would not have been liable for GE's security fraud, had he known about it.  See Opp. at 20 n.16, 31 n.22.  But whether Mr. Buffett's personal liability was at stake is beside the point.  Under Tellabs, all the inferences emanating from a complaint must be considered, including the inference that Mr. Buffett would risk his legendary reputation for integrity and investment acumen by investing in a company that allegedly had so callously and so recently disregarded its obligations to the investing public.

[23] As Plaintiffs allege, GE Capital comprised more than 75% of the assets on GE's balance sheet. Compl. ¶ 149 n.10.

fast-paced demands of the time made more likely that an underwriter would work swiftly.  See

Def. Mem. at 22-23.

        Finally, Plaintiffs repeatedly criticize GE for "never actually stat[ing] on the

record what did happen" between September 25 and October 1.  See, e.g., Opp. at 32.  If the

Complaint survives – and it should not – Defendants will show that GE was not planning or

considering an equity offering on September 25.

## II.    THE COMPLAINT FAILS TO ALLEGE LOSS CAUSATION

        Plaintiffs have still failed to show how Defendants' alleged failure to disclose the

equity offering caused their claimed loss.  In fact, their opposition memorandum essentially

makes Defendants' argument.  As Defendants stated in their opening memorandum, see Def.

Mem. at 29-30, and as Plaintiffs now acknowledge, see Opp. at 19 n.15, *news* that an offering is

forthcoming and the *pricing* of that offering are distinct.  Plaintiffs allege that only the news of

the offering was fraudulently concealed on September 25.  Plaintiffs do not allege that

Defendants concealed the pricing of the offering on September 25, because they admit that an

offering is not priced until immediately before the shares are sold.  See Compl. ¶ 159; Opp. at 19

n.15.  And Plaintiffs also allege, as they must, that only the pricing of the offering caused GE's

stock price to drop.  See Compl. ¶¶ 111, 114.  Plaintiffs do not, and cannot, allege that news of

the offering – the allegedly concealed information – caused GE's stock to drop because, when

the news was announced, GE's stock rose.  Plaintiffs therefore fail to plead loss causation.  See

Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005) (A plaintiff must show that

"the misstatement or omission concealed something from the market that, when disclosed,

negatively affected the value of the security.").

        Plaintiffs misconstrue the "zone of risk" analysis adopted in Lentell and applied in

In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29 (2d Cir. 2009), and suggest that

"Defendants can be held liable for simply being aware of the risk of misleading the market."

Opp. at 33. That is wrong. "[T]o establish loss causation [under the zone of risk analysis], a

plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the

actual loss suffered." Lentell, 396 F.3d at 173 (internal quotation marks and alteration omitted)

(emphasis in original). The subject of the alleged omission here was news of the equity offering,

but only the pricing of the offering — which could not have been concealed on September 25,

because it was concededly unknown — allegedly caused Plaintiffs' loss.

It is not sufficient to plead loss causation, as Plaintiffs continue to allege, that the

offering discount was foreseeable. If the discount were foreseeable on September 25, when

Plaintiffs allege the news of the offering was wrongfully concealed, then the discount would

have been equally foreseeable on October 1, when the offering was actually announced. And if

the foreseeability of the discount would have caused GE's stock price to drop on September 25,

the same foreseeability would have caused a drop on October 1. Yet GE's stock price increased,

not decreased, when the news of the offering was announced.

Finally, Plaintiffs have still made no effort to "distinguish the alleged fraud from

the 'tangle of other factors' that affect a stock's price," although they must where, as here, there

has been a general market decline that could instead account for plaintiffs' losses.[24] In re Merrill

Lynch & Co. Research Reports Sec. Litig., 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (quoting

Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343 (2005)). In addition, Plaintiffs ignore several

---

[24] In arguing that only a regression analysis can prove that the October 2 stock decline was due to the general market, Opp. at 34 n.24, Plaintiffs ignore their pleading burden that where, as here, there is an overall market decline, they must "allege[] facts that would allow a factfinder to ascribe some rough proportion of the whole loss to [Defendant's] misstatement." Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 158 (2d Cir. 2007).

other likely explanations for the pricing of the October 2 offering, including that the public

offering price matched the exercise price of Mr. Buffett's warrants announced on October 1.

Plaintiffs also ignore that other companies that conducted offerings during this period, and are

not accused of securities fraud, discounted their stock comparably to GE.  See Def. Mem. at 12-

13, 30-31.  Accordingly, Plaintiffs have failed to plead loss causation.

## III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)

For the reasons stated in Defendants' opening memorandum, see Def. Mem. at 34,

Plaintiffs have failed to allege any elements of a Section 20(a) violation.  Accordingly that claim

should also be dismissed.

## CONCLUSION

For the foregoing reasons and those set forth in their opening memorandum,

Defendants respectfully request that the Court dismiss the Third Amended Class Action

Complaint with prejudice.


Dated: New York, New York
       April 14, 2010

                                        WEIL, GOTSHAL & MANGES LLP

                                        By: _____

                                            Greg A. Danilow
                                            Paul Dutka
                                            767 Fifth Avenue
                                            New York, New York  10153
                                            T:  (212) 310-8000
                                            F:  (212) 310-8007

                                        *Counsel for Defendants General Electric Company,
                                        Jeffrey R. Immelt, and Keith S. Sherin*

Of Counsel:

        Gregory Silbert
        Adam Banks